104 N.J. Super. 481 (1969)
250 A.2d 431
STATE OF NEW JERSEY, PLAINTIFF,
v.
NORMAN FORER, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 11, 1969.
*484 Mr. Christopher R. Wood, Assistant Prosecutor, argued the cause for plaintiff (Mr. Edward J. Dolan, Middlesex County Prosecutor, attorney).
Mr. Jack Wysocker, for some of the defendants (Messrs. Mandel, Wysocker, Sherman, Glassner, Weingartner & Feingold, attorneys).
Mr. Robert W. Lewandowski, for some of the defendants (Messrs. Wilentz, Goldman & Spitzer, attorneys).
Mr. Ronald W. Spevack, for some of the defendants (Messrs Spevack & Spevack, attorneys).
HALPERN, A.J.S.C.
This is a joint motion by 37 defendants to dismiss four indictments charging rioting, unlawful assembly and assault upon a police officer. Their motion attacks the methods used by the jury commissioners in selecting the grand jury which indicted them, contending *485 such methods violated the laws and constitutions of the State of New Jersey and of the United States. In particular, they contend the grand jury was not truly representative of a cross-section of the community because "blue-collar, hourly-paid wage earners," were systematically excluded. Under attack is the system used to select grand jurors in Middlesex County for the past 20 years.
This challenge to the grand jury array is made under R.R. 3:3-2(b) which provides:
"(b) MOTION TO DISMISS. If a defendant has been held to answer a complaint charging an indictable offense after the grand jury by which he is indicted has been impanelled, a motion to dismiss the indictment may be based on objections to the array."
The complaints against defendants were filed in August 1966, and the grand jury which indicted them was sworn and impanelled in January 1968. It seems clear that R.R. 3:3-2(b) cannot be used as the vehicle for this motion since the complaints were made before the grand jury was impanelled. This motion should have been made before the January 1968 grand jury was sworn. R.R. 3:3-2(a). The obvious purpose of R.R. 3:3-2(a) is to compel an attack on the array of grand juries to be brought before they are sworn and begin to function. If an attack is permitted after they are sworn all indictments brought in by them, and proceedings taken in reliance thereon by way of trial or plea, would be subject to challenge. No sound reason is presented for relaxing the rule under R.R. 1:27A; however, if it is ultimately decided that I misconstrued R.R. 3:3-2(a) and (b), I will consider the defendants' motion on its merits.
Attacks on the array of grand juries are today being made with great frequency throughout the country and in New Jersey. While the factual patterns differ, the basis of the attacks are similar to the one being made in this case. The generally accepted principles of law applicable to such attacks are that where there is a systematic exclusion *486 from jury duty of a recognizable identifiable group within the community, the Equal Protection Clause of the Fourteenth Amendment is violated irrespective of a showing of prejudice. Crawford v. Bounds, 395 F.2d 297, 308 (4th Cir. 1968). If the exclusion results, it is condemned regardless of whether it is due to neglect or because of intentional conduct. Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 (3 Cir., 1955), certiorari denied 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956). The case of Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) sets forth the constitutional limits:
"* * * We of course recognize that the Fourteenth Amendment reaches not only arbitrary class exclusions from jury service based on race or color, but also all other exclusions which `single out' any class of persons `for different treatment not based on some reasonable classification.' Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 [870];" (at pp. 59, 60, 82 S.Ct., at p. 161)
When a party challenges the array of a jury, grand or petit, the burden is upon the challenger to establish an unlawful discrimination. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); State v. Smith, 102 N.J. Super. 325, 346 (Law Div. 1968). There is a presumption that the jury commissioners acted within the scope and authority of their office. Pope v. United States, 372 F.2d 710, 723 (8 Cir. 1967); State v. Stewart, 2 N.J. Super. 15, 23 (App. Div. 1949). The means and methods used to select jurors must be designed to insure that they are impartially drawn from a cross-section of the community. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), rehearing denied 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186. When the formation of a jury is attacked, courts test the source from which the jury list is comprised and not the composition of any given panel. Thiel v. Southern Pac. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). A jury panel need *487 not be a perfect mirror of the community or reflect the proportionate number of every identifiable group. Swain v. Alabama, supra.
It is against this backdrop of legal principles that I turn to the uncontradicted facts dealing with the selection of grand juries in Middlesex County. Annually, the jury commissioners secure a list of approximately 25,000 names from the Middlesex County voter registry lists. These names are proportionately selected at random from every section of the county. A questionnaire, approved as to form by the New Jersey Supreme Court, is then sent to the persons selected. R.R. 1:29-2. When returned these questionnaires are screened by the jury commissioners to determine qualifications pursuant to N.J.S.A. 2A:69-1, and exemption under N.J.S.A. 2A:69-2. The remaining names are then placed into two pools; the grand jury pool consists of approximately 800 names, and the petit jury pool of approximately 30,000 names. Upon orders of the assignment judge, entered three times a year for each stated court session, the jury commissioners select at random from such pools 200 grand jurors' names and 3,500 petit jurors' names. N.J.S.A. 2A:70-1. These lists are then submitted to the assignment judge of the county for processing, and thereafter are filed in the office of the county clerk as a public record. N.J.S.A. 2A:70-2 and 3. This processing is completed at least 25 days before the opening of the court session. N.J.S.A. 2A:70-3. In formulating the list of grand jurors the proofs indicate that the jury commissioners attempt to obtain qualified persons. To that end they examine the returned questionnaires and consider the juror's occupation, education and experience.
The thrust of defendants' attack is two-pronged. Firstly, they charge the jury commissioners improperly limited their selection of names to the voter registry lists; and secondly, they had no right to exercise any discretion in selecting names for the grand jury list.
*488 In using only the voter registry lists defendants argue that the jury commissioners have disregarded their affirmative duty to take appropriate action to secure a representative cross-section of the community. Cassell v. Texas, 339 U.S. 282, 289, 290, 70 S.Ct. 629, 94 L.Ed. 839 (1950). They point to the Manual for the Use of Jury Commissioners of the State of New Jersey (hereinafter "Manual") which suggests that more than one source for names should be used. It is intimated that the jury commissioners should somehow seek out lists of names (from unnamed sources  presumably social, religious or fraternal groups) to insure having jurors from all classes, groups, religions, colors and creeds. The simple answer to this argument is that the Manual merely suggests and does not direct. Additionally, if such were done defendants would complain that the wrong sources were utilized, or that the sources used did not have Negroes, Puerto Ricans, or other groups, as members, or that an insufficient number of them were selected.
The use of only the voter registry lists, where information on race and occupation does not appear, is a sounder constitutional method of selection because it presents no opportunity for discrimination. Any attempt to obtain names from outside sources to insure inclusion of all races, colors, creeds and groups, opens the door to a charge of deliberate discrimination in favor of such groups selected.
The use of voter registry lists has long been approved in the federal courts. United States v. Kelly, 349 F.2d 720, 778 (2 Cir. 1965), certiorari denied 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). Registration is available to all qualified persons and the use of voting lists does not discriminate against an identifiable racial, social or economic group. United States v. Bowe, 360 F.2d 1, 7 (2 Cir.), certiorari denied 387 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966); United States v. Birell, 276 F. Supp. 798, 822 (S.D.N.Y. 1967). In fact the Jury Selection and Service Act of 1968, 28 U.S.C.A. *489 1861 et seq., as implemented by a joint order of the Chief Judges of the United States District Court for the District of New Jersey, and the Third Circuit Court of Appeals, filed September 25, 1968, and approved by the Reviewing Panel of the Third Circuit Court of Appeals, limits jury selection primarily to voter registry lists. The source used for jury selection by the Middlesex County jury commissioners meets today's federal standards and I find it to be unobjectionable.
I turn now to defendants' second argument that the jury commissioners improperly exercised their discretion in selecting a "better type juror" for the grand jury  they contend that in so doing they wrongfully discriminated against "blue-collar, hourly-paid wage earners." They flatly charge that not a single person of that classification was included in the list of 200 grand jurors submitted for the January 1968 court session. From this premise they argue that since defendants are mostly, if not all, Puerto Ricans, and since (presumably) most Puerto Ricans are of the class or type discriminated against, the grand jury was illegally constituted and these indictments should be dismissed. I disagree.
In order to deal with defendants' arguments it is necessary to define the term "blue-collar, hourly-paid wage earners." The term "blue-collar" is defined in Random House Dictionary of the English Language (1966 ed.), as "of or pertaining to wage earning workers who wear work clothes or other specialized clothing on the job, as mechanics, longshoremen, miners, etc." I see no special significance in the term "hourly-paid wage earners," as used by defendants, because there is no logical distinction between wage earners paid by the hour, day or week. Is this kind of group or class sufficiently identifiable so that it can be said their systematic exclusion from a grand jury, as in cases of race, color, or creed, violates a defendant's constitutional rights? I do not think so.
*490 This attempted classification can only lead to uncertainty, and ultimately chaos, in the administration of justice. If "blue-collar, hourly-paid wage earners" is supposed to represent persons in the low economic class, it can readily be anticipated that there will be endless and insoluble problems. It will be argued, with justification, that many "blue-collar" workers earn more money than persons in some professions, or wage earners in categories other than "blue-collar." Counsel, with an agile imagination, can conjure up all kinds of classes or groups that he will contend were systematically excluded from jury service. Defendants' attempted classification of "blue-collar, hourly-paid wage earners" is not a suffciently meaningful classification of an identifiable group, or an appropriate class, to provide a basis for an attacke to the array of the grand jury. United States v. American Oil Co., 286 F. Supp. 742, 745 (D.N.J. 1968).
Even if there were substance to defendants' attempted classification, the foundation of facts upon which it rests is made of sand. Defendants' facts are derived from the jurors' answers to the questionnaires. Question No. 9 asks "What is your occupation?" and the juror is given a line three inches long on which to answer. It is the jurors and not the jury commissioners who, in a word or two, classify their occupations. A random selection of answers from the grand jurors on the list for the January 1968 court session runs as follows: "personnel manager," "retired teacher," "maintenance supervisor," "businessman," "bookkeeper," "geologist," "bank clerk," "buyer," "credit manager," "housewife," "I.B.M. operator," "salesman," "adv. artist," "postal inspector," "technician," "banker," "homemaker," "engineer," "librarian." It is obvious that these occupations represent a true cross-section of working people from various categories of our economic life. How are we to know whether they are properly classified as "blue-collar, hourly-paid wage earners?" Defendants reach their conclusions on pure speculation. It is significant that these *491 occupations listed for the grand jurors appear also as the occupations for many petit jurors.
Defendants also lay great stress on a letter survey counsel made of 1,000 grand jurors whose names were on the grand jury lists from 1962 through May, 1968.[1]
The letter was mailed to only 898 grand jurors. For some unexplained reason the letter inquiries were not sent to 102 of the grand jurors. Only 787 were received and I assume 111 were returned undelivered to counsel. 368 of the 787 actually served on grand juries. Only 361 (45.8%) of the 787 replied, and of those replying only 157 served as grand jurors. 2.6% of those who served indicated they were Negroes; none indicated they were Puerto Ricans. The fallacy of defendants' arguments that these figures show an exclusion of "blue-collar, hourly-paid wage earners" is readily seen. The inquiry letter only sought to ascertain the number of Negroes or Puerto Ricans who served. Why was it so limited? Why was no effort made to ascertain their specific occupations or income? Such an inquiry might have been more relevant. For example, when a grand juror states he is a "banker," does this mean he is an officer in the bank, or merely a teller? If he indicates he is a "maintenance supervisor," *492 does this mean he is in charge of some part of a plant operation or merely a janitor? Furthermore, only 361 answers were received, leaving 639 unknown quantities out of the sample 1,000, hardly sufficient on which to base a reasonable conclusion. Some unanswered questions, which would be vital to a fair analysis of any conclusion are, how many of the 639 could not afford to serve at the rate of $5 per day, plus mileage; how many were excused from service for varying kinds of economic hardship, or could not devote four months of their time to serving? How many of the 639 would fit within defendants' classification of "blue-collar, hourly-paid wage earners?" Many similar queries can be raised, and without answers to them we are left to speculation and surmise. I therefore find that the defendants' conclusions are based on "sample facts" which are without foundation in fact, illusory and highly speculative.
It is important to face up to defendants' charge that jury commissioners may not exercise any discretion in formulating the list of grand jurors. They contend all names, after being screened for qualifications and exemptions, should be put in one list, and from that list the grand and petit jurors should be selected at random. Again, I do not agree.
The statute, N.J.S.A. 2A:68-1, directs the Supreme Court to appoint two jury commissioners for each county who are not members of the same political party. It prohibits the commissioners from holding any public office except that of sheriff. It is clear that the Legislature considered the office of jury commissioner to be one of great importance and responsibility because of the means provided for appointment and the restrictions imposed. This view was shared by the Supreme Court when it adopted R.R. 1:25C forbidding jury commissioners from holding elective office, or engaging in partisan political activity. If the defendants' arguments were to be adopted there would be no need for the office of jury commissioner because the duties and functions defendants would impose on them would be routine and could be performed by any ordinary clerk. Such *493 views are in sharp contrast with what the Legislature and the Supreme Court envisioned  they anticipated the jury commissioners would have to exercise discretion in carrying out the statutory mandate of selecting qualified persons to serve as grand and petit jurors.
Using the returned questionnaires as a basis for their selection of the grand jury list, the jury commissioners were merely following the statutory directive to prepare two jury lists "having regard to the just distribution of jury service among those persons qualified therefor * * *." N.J.S.A. 2A:70-1. The means and methods used for the selection of jurors is a legislative function. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1952). While no other statutory standards are given, they followed the suggestions of the Manual and tried to obtain the names of "those who are best suited to serve in such capacities" (Manual, at p. 10); they exercised their best judgment in selecting persons who are "intelligent, sensible, honest, impartial and courageous," and did not choose persons they believed to be "politically active, easily influenced or of doubtful integrity," (at p. 18); they refrained from excluding anyone due to "race, color, creed, national origin, or ancestry," because to do so would have been a crime. N.J.S.A. 2A:72-7.
Grand jurors have the heavy burden of deciding, in secret, whether a person should be charged with a crime; a presentment made against a public official, or an investigation made into public affairs, corruption, syndicated crime, etc. The petit jury's sole function is to determine issues of fact in civil and criminal cases, and to determine the guilt or innocence of a defendant charged with a crime. The functions of both are highly important, carry great responsibility and are necessary to the sound administration of justice and our form of democracy.
The New Jersey Supreme Court has recently recognized the important function played by grand juries in our system of jurisprudence. In the case of In re Addonizio, 53 *494 N.J. 107 (1968), it approved their right to go on a fishing expedition when investigating public corruption without showing probable cause to subpoena records which the police must do to obtain a search warrant under the Fourth Amendment. It paid tribute to the importance of their function when it said:
"It must be assumed that a grand jury is not an officious meddler. It never was our rule that a grand jury may explore only specific charges already made. * * * The grand jury may investigate upon its own suggestion, and in addition to indictments for crime, it may return `presentments' upon conditions of public interest even though no violation of a penal statute is found." (at p. 124)
The need for qualified jurors has long been recognized by those concerned with the problem. The consensus is that "the jury list should represent as high a degree of intelligence, morality, integrity, and common sense as possible." (Recommendation, Judicial Conference of the United States, 26 F.R.D. 409, 425 [1961]). When this commendable goal is joined with the equally desirable aim that the jury list be representative of a cross-section of the community, they would appear to be inherently in conflict. This is so because unless the jury commissioners are given the discretionary right to be selective, the desired results cannot be reached. If we concede that no system of jury selection will be perfect, then it stands to reason that jury commissioners must have the power to choose qualified jurors even though some loss results in the cross-section character of the jury composition. What the courts must be vigilant to stop are discriminatory practices which would defeat the ultimate objective of securing juries capable of dealing effectively with the complex controversies presented to them. A.B.A., Standards Relating to Trial by Jury (Tentative Draft, 1968), pp 51-57.
I therefore conclude that the jury commissioners properly exercised their judgment in formulating the grand jury lists, and their actions did not result in a systematic *495 exclusion of any identifiable group, class, race or creed, from grand jury service in Middlesex County.
For the reasons expressed defendants' motion is denied.
NOTES
[1] September 27, 1968
 Mr. James W. Cassidy
 69 Wilk Rd.
 Edison, N.J.
 Dear Mr. Cassidy:

We are making a survey of Grand Jurors who served in Middlesex County during the past five or six years in order to ascertain which of them, if any, are Negro or of Puerto Rican descent. Our investigation indicates that you served on one of the Grand Juries during that time. We would appreciate your advising us by noting below and returning via the enclosed envelope, as to whether you are Negro, Puerto Rican, or from neither ethnic or racial grouping.
Thank you for your anticipated courtesy and co-operation.
 Very truly yours,
 Place check mark where _______________________
 appropriate: JACK WYSOKER, ESQ.
 NEGRO ___________________ 313 STATE STREET
 PUERTO RICAN ____________ PERTH AMBOY, NEW JERSEY
 OTHER ___________________