Willie Edward KING, Petitioner,

v.

Thomas D. COOK, Superintendent of the Mississippi State Penitentiary at Parchman, Mississippi, Respondent.

No. GC 6828–K.

United States District Court
N. D. Mississippi,
Greenville Division.

April 14, 1969.

Lawrence Aschenbrenner, Jackson, Miss., for petitioner.

Guy N. Rogers, Asst. Atty. Gen., Jackson, Miss., for respondent.

## OPINION OF THE COURT

KEADY, Chief Judge.

On February 27, 1969, this court held an evidentiary hearing on the sole remaining contention [1] raised in Willie Edward King's petition for writ of habeas corpus filed July 12, 1968—whether or not members of the Negro race were systematically excluded from the jury list compiled by the Board of Supervisors of Quitman County, Mississippi, in April, 1966, from which the grand and petit juries which indicted and convicted petitioner for grand larceny were drawn.

In an opinion dated January 22, 1969, see footnote 1 supra, we determined that the petitioner had made a prima facie case of systematic exclusion by showing that, while the adult Negro males of Quitman County, Mississippi, comprised 56% of the jury-eligible population of 4680 persons, only 76 or 21% of the 354 persons on the jury list compiled in April 1966 were known Negroes.[2]

The relevant stipulated facts presented at the habeas hearing are as follows: According to the 1960 census, Quitman County's adult jury-eligible population was composed of 2,630 non-white males and 2,050 white males, 56% and 44% of the jury-eligible population, respectively. From April 1960 to April 1965, the jury lists of Quitman County were 4.6% Negro and 95.4% white; the venires chosen from said lists, and also the grand and petit jurors chosen from

1. A summary of the background of this case, both prior to and following King's filing a petition for writ of habeas corpus in this court, has been extensively detailed in this court's opinions in King v. Cook, 287 F.Supp. 269 (N.D.Miss. 1968), and in King v. Cook, 297 F.Supp. 99 (N.D.Miss. January 22, 1969). In the latter opinion, we determined that the various contentions other than that of systematic exclusion had been fully and fairly adjudicated in the Mississippi State courts, both as to relevant facts and controlling federal constitutional principles, and would, therefore, not be further litigated here.

2. Although there was some attempt by the state at petitioner's trial to explain the racial disparity on the April 1966 master jury list by showing that since the 1960 census more Negroes than whites had emigrated to other states, this contention was refuted by stipulation at the federal habeas corpus hearing. According to the report of the Mississippi State University Agricultural Experiment Station, between July 1, 1960, and July 1, 1966, there was an emigration of 9.8% of the white population of Quitman County and an emigration of 9.1% of the non-white population of Quitman County.

said venires, were approximately 5% Negro and 95% white. From 1956 to the present, the rolls of registered voters in Quitman County have been the sole source of names from which the Board of Supervisors have chosen the jury lists. As of April 1, 1966, there were 2,216 registered male voters eligible for jury service. Of that number, 1,764 or 79.6% were white and 452 or 20.4% were non-white. Eighty-six percent of the adult white males in Quitman County were registered voters as compared with only 17% of the adult non-white males.

The master jury list compiled by the Board of Supervisors in April, 1966,[3] was composed of the following numbers of persons by beat and by race:

|  | White | Negro |  | Unknown | Total |
|---|---|---|---|---|---|
| Beat One | 68 | 33 | (32.6% of Total) | 0 | 101 |
| Beat Two | 24 | 11 | (31.4% of Total) | 0 | 35 |
| Beat Three | 69 | 19 | (21.1% of Total) | 2 | 90 |
| Beat Four | 33 | 7 | (17.07% of Total) | 1 | 41 |
| Beat Five | 69 | 22 | (24.6% of Total) | 3 | 94 |
| Totals | 263 | 92 | (25.5% of Total) | 6 | 361 |

The list of registered male voters at the time of the compilation of the master jury list was composed of the following number of persons by beat and by race.

|  | White | Negro | Total | White male % | Negro male % |
|---|---|---|---|---|---|
| Beat One | 337 | 105 | 442 | 76.5 | 23.5 |
| Beat Two | 82 | 48 | 130 | 63.1 | 36.9 |
| Beat Three | 650 | 188 | 838 | 77.6 | 22.4 |
| Beat Four | 111 | 12 | 123 | 90.3 | 9.7 |
| Beat Five | 584 | 99 | 683 | 85.5 | 14.5 |
| Totals | 1,764 | 452 | 2,216 | 79.6 (av.) | 20.4 (av.) |

The venire from which the grand jury which indicted petitioner was drawn was made up of 14 Negroes (22.5%) and 48 whites; the grand jury which indicted him was composed of 3 Negroes (16.7%) and 15 whites. The venire from which the petit jury was drawn which convicted petitioner was made up of 8 Negroes (22.2%) and 28 whites, while the petit jury which convicted him was made up of 2 Negroes (16.7%) and 10 whites.

Literacy tests were given to all persons offering to vote, white and non-white, as a prerequisite to voter registration in Quitman County until August 1965, pursuant to then existing state law. Payment of poll tax was also a condition precedent to registration for federal elections until the passage of the 24th Amendment to the United States Constitution on February 4, 1964, and in state and county elections in Mississippi until April 6, 1966, the date of the decision of a three-judge Federal District Court in United States v. Mississippi. However, payment of poll tax was not considered by the Quitman County Board of Supervisors in draw-

3. The 1966 jury list was compiled by the Supervisors on April 4, 1966.

ing the above master jury list in April 1966. From 1962 to June 30, 1965, the names and addresses of each applicant for voter registration were published twice in a local newspaper within the 30-day period following application, pursuant to Mississippi Code Annotated § 3212.7, which was repealed June 30, 1965.

The oral testimony adduced at the evidentiary hearing was sufficient to show that Quitman County Negroes faced with the awesome combination of literacy tests, poll tax, statutorily required publication of registration applicant's names, active repression of registration by whites of Negro registration, and fear of Negroes for their jobs and places of abode, were, at least until mid-1965, generally hesitant to apply for voter registration, and this testimony is amply bolstered by the county voter registration statistics.[4]

Most of petitioner's witnesses did not themselves become registered voters until 1965 after the literacy tests were abolished, either because they were unable to pass them, or because they refrained from taking the tests for fear of embarrassment. They recalled an occasion in 1965 when a group of approximately 50 Negro citizens went to the county courthouse for mass registration. At that time, the local law enforcement officials refused to admit them to the building en masse, and agreed to accept their applications only in smaller groups. Tickets were passed out among them and approximately 20 of their number were permitted to apply that date, and similarly sized groups were admitted from day to day thereafter until all had applied. Few of them passed the literacy tests. Reticence to apply for registration might have been intensified by efforts of white plantation owners to thwart voter registration drives on their property, by publication in the local newspaper of the names

and addresses of all applying for registration, and by a feeling among some Negroes that they might lose their jobs and homes if they attempted to register.

It is apparent that by mid-summer of 1965, when the literacy tests were abolished, the trepidation of Negroes had largely been dispelled, for, between August 9, 1965, and May 25, 1966, 807 Negroes became registered voters as compared with only 359 whites. While it did achieve a moderate success, the voter registration drive fell far short of overcoming the racial imbalance reflected on the voter registration rolls; and most significantly so in the case of adult Negro males, of whom only 17% were registered voters as compared to 86% of the adult white males. It is upon this lingering imbalance, engendered by the previously prevailing combination of statutory limitation and administrative discrimination on the part of the local officials, that petitioner bases his case. Stated differently, his contention is that it was the duty of the Board of Supervisors, having knowledge of the racial inequality of the jury source list, to supplement the voter registration rolls with lists of the tax assessors, city directories, telephone directories, public utility rolls or any such source in order to equalize, as nearly as possible, the percentage of Negroes on the jury list with the percentage of Negroes in the county.

In cases of this nature, we must necessarily begin with the well-settled principle that "a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race." Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664 (1880); Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). In determining whether a class

---

4. The stipulation of counsel illustrates that as of June 1, 1962, there were 436 Negroes registered to vote in Quitman County as compared with 2,991 whites. Between

August 9, 1965, and May 25, 1966, however, 807 Negroes became registered voters as compared with only 359 whites.

has been "systematically excluded", we are guided by the requirement that the jury source list must reasonably reflect "a cross-section of the population suitable in character and intelligence for that civic duty." Brown v. Allen, 344 U. S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 (1953); see also Scott v. Walker, 358 F.2d 561 (5 Cir. 1966); Labat v. Bennett, 365 F.2d 698 (5 Cir. 1966); Rabinowitz v. United States, 366 F.2d 34, (5 Cir. 1966). The constitutional duty to develop and utilize a system that will result in a "fair cross-section of the community" being placed on the master jury lists rests upon the jury selection officials, both federal and state. Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). The inquiry here, then, is resolved to this—whether the procedure used by the Board of Supervisors in compiling the master jury list in April 1966 was calculated to result in a fair cross-section of the population of Quitman County.

■ On the basis of the stipulated facts and the testimony at the evidentiary hearing, we must conclude that the master jury list of April 1966, drawn exclusively from the voter registration rolls, did not constitute a reasonable cross-section of the population of Quitman County, as a direct result of past official discrimination against Negro voter registration.

■ The proof at the hearing showed that, although all legal and administrative impediments to Negro registration had been removed prior to April 1966, the fear of reprisal at the hands of the white community, albeit unfounded, was still present in the minds of a substantial segment of the Quitman County Negro population. This being so, the indictment and conviction of petitioner may not stand.

■ True, the Board of Supervisors was empowered to utilize no source list other than the voter registration rolls,[5] and its failure to supplement the only available source may, therefore, not be condemned as active class discrimination. What we are concerned with, however, in determining whether constitutional standards have been met are objective results. See, e. g., Avery v. Georgia, supra; Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942); Brooks v. Beto, 366 F.2d 1 (5 Cir. 1966). Notwithstanding the fact that the Board of Supervisors was unable to use any source other than the voter registration rolls in selecting the jury list, the trial court, confronted with the facts presented by petitioner on motion to quash his indictment, should have granted the motion and summoned a common-law jury from the body of the district. Black v. State, 187 So.2d 815 (Miss.1966).

■ In short, it is an inescapable fact that the voter registration rolls of April 1966 remained unconstitutionally tainted by the vestiges of a state-sanctioned discriminatory voter registration procedure, the effect of which was to prevent adequate representation of Negroes on Quitman County jury lists. While representation of the races in precise proportion to that of the adult population is not required, there may not be validly used a jury selection system which cannot produce a fair relationship to the community.[6]

---

5. Use of the land assessment rolls as an alternative jury source was authorized by Miss.Code Ann. § 1762-01 (Supp.1966) enacted by the legislature in 1964, but use of this source is permissible only when an order is entered by the Circuit Judge pursuant thereto. No such order has been issued for Quitman County.

6. For example, in Swain v. Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court of the United States held that purposeful discrimination was not established by showing that Negroes were underrepresented by as much as 10%, stating:

"Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."

See also Raiford v. Dillon, 297 F.Supp. 1307 (S.D.Miss.H.D., March 18, 1969),

The resultant grand and petit juries which indicted and convicted petitioner must, therefore, be condemned under standards set by the Mississippi Supreme Court, see, e. g., Watts v. State, 196 So.2d 79 (Miss.1967); Black v. State, supra, and the federal courts alike.[7]

An order will accordingly be entered releasing the petitioner from any further restraint upon his liberty by the State of Mississippi, without prejudice, however, to the State to re-indict petitioner within a period of six months from date of said order.

where underrepresentation of Negroes by 12% was found not to be indicative of discrimination, and Love v. McGee, 297 F.Supp. 1314 (S.D.Miss.J.D., March 17, 1969), holding a disparity of 46% to constitute prima facie evidence of systematic exclusion.

7. See, e. g., Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Scott v. Walker, supra; Billingsley v. Clayton, 359 F.2d 13 (5 Cir. 1966); Jackson v. United States, 366 F.2d 34 (5 Cir. 1966); Labat v. Bennett, supra.