John William SMITH, Appellant,

v.

Howard YEAGER, Warden, New Jersey
State Prison, et al.

No. 71–1650.

United States Court of Appeals,
Third Circuit.

Argued Feb. 8, 1972.

Decided July 18, 1972.

Certiorari Denied Dec. 18, 1972.
See 93 S.Ct. 685.

Harris David, Newark Essex Joint Law Reform Project, Newark, N. J., for appellant.

David S. Baime, Asst. Prosecutor of Essex County, Newark, N. J., Joseph P. Lordi, Essex County Prosecutor, Newark, N. J., (Thomas McCormick, Legal Asst., on the brief), for appellee.

Before KALODNER, HASTIE and MAX ROSENN, Circuit Judges.

## OPINION OF THE COURT

MAX ROSENN, Circuit Judge.

Appellant has challenged the jury selection procedures used to impanel the grand and petit juries of Essex County, New Jersey, which were instrumental in indicting and convicting him of assault and battery.[1] He contends that both the "key man" system used to select the grand jury venires, and the system based on voting lists and city directories used to choose the petit jury venires, were constitutionally defective because they excluded disproportionate numbers of Negroes, women, working class, and residents of Newark.

## I. THE BACKGROUND

Appellant is a Negro male. He bases his claims on both the equal protection and due process guarantees of the fourteenth amendment to the Constitution, but because of our disposition of this case, we need consider only one question: did the "key man" system employed in Essex County, New Jersey, invidiously discriminate in the selection of Negro grand jurors so as to deny appellant the equal protection of the law.[2]

1. Appellant was one of approximately 94 defendants arrested during the civil disturbances in Newark, New Jersey in 1967 who filed timely motions under former New Jersey Rule, N.J.R.R. 3:3-2(a) (b) (now N.J.R.R. 3:6-2) to dismiss the indictments against them based, inter alia, on the improper selection of the grand jury. See, State v. Forer, 104 N.J.Super. 481, 250 A.2d 431 (1969). (Any defendant who has not made such a timely motion may be barred from raising the issue on appeal or by habeas corpus.) Because of common questions of law and fact, the Superior Court Law Division ordered consolidated argument on the various motions which lasted several days. Of the group of 94, 71 of the indictments were dismissed, 16 defendants were found guilty, 6 were found not guilty and one failed to appear in court. We have on appeal only Smith's petition. In addition to the evidence developed before the Superior Court, the District Court for the District of New Jersey requested certain additional information, primarily census figures, at the time of the habeas corpus hearings.

2. Besides attacking the composition of the grand and petit juries, appellant has also contended on this appeal that the oath required of all grand jurors in New Jersey is illegal and operates to deny him due process. Our disposition of this case in no way reflects a final judgment on the merits of the claims with regard to the selection of the petit jury or the grand jury oath. The recent Supreme Court decision of Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) rejected the application of most due process standards to the selection of state grand juries, and so we reject appellant's arguments made on such grounds here. But see Peters v. Kiff, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). A grand jury is not necessarily unfair or impartial because of a disproportionate representation of classes of

All of appellant's claims were rejected by the state courts in State v. Smith, 102 N.J.Super. 325, 246 A.2d 35 (1968), aff'd. 55 N.J. 476, 262 A.2d 868 (1970), cert. denied, 400 U.S. 949, 91 S.Ct. 232, 27 L.Ed.2d 256 (1970), and his habeas corpus petition [3] has been rejected by the District Court for the District of New Jersey in an unreported opinion.

These opinions relied heavily on Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), for the proposition that the appellant had to show something more than steady under-representation of the various groups to make out his prima facie case of a denial of equal protection. The Superior Court of New Jersey decided after a full hearing that it was incumbent on appellant to show a deliberate, systematic discrimination against members of his race. 246 A.2d at 46. The Supreme Court of New Jersey affirmed that test. The United States District Court conducted a thoughtful and thorough review of the cases and the facts of Smith's habeas corpus petition, concluding that appellant had to show: (1) a deliberate practice of total exclusion; (2) a deliberate practice of token inclusion; or (3) a deliberate interference with an otherwise valid procedure. It decided that none of the three situations had been shown and that appellant had failed to make out even a prima facie case. It attributed the under-representation of certain classifications of citizens, including Negroes, not to purposeful discrimination, but to the imperfections in the selection process.

In other words, the Superior Court and the District Court believed that it was

not sufficient for the appellant's prima facie case to show that the consistent under-representation of Negroes on the grand jury was the likely result of a course of deliberate action by the Jury Commissioners of Essex County in seeking out "key men" who would supply names for grand jury service. We disagree.

For almost one hundred years the Supreme Court has made clear that:

> The right to a trial by jury is guaranteed to every citizen of [the state] by the Constitution of that State, and the constitution of juries is a very essential part of the protection such a mode of trial is intended to secure. The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds.

Strauder v. West Virginia, 100 U.S. 303, 308, 25 L.Ed. 664 (1880).

As such, there should be a truly representative cross-section of the community on a grand or petit jury, Carter v. Jury Commission of Greene County, 396 U.S. 320, 330, 90 S.Ct. 518, 24 L. Ed.2d 549 (1970); Smith v. Texas, 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940), although there need not be proportional representation of each element of the population entitled to serve. Cassell v. Texas, 339 U.S. 282, 286–287, 70 S.Ct. 629, 94 L.Ed. 839 (1950). However, "[o]nce the State chooses to provide grand and petit juries, whether or not constitutionally required to do so

---

citizens in the community. *See* United States ex rel. Chestnut v. Criminal Court of City of New York, 442 F.2d 611 (2d Cir. 1971), cert. denied, 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed.2d 98 (1971) (*see* note 21 *infra*). For a discussion of the appropriateness of due process objections to the composition of a jury venire, *see*, Note, The Defendant's Challenge to Racial Criterion in Jury Selection: A Study in Statutory Due Process and Equal Protection, 74 Yale L.J.

3. Appellant is presently on bail pending appeal pursuant to the order of this court dated July 19, 1971. The conditions attached to that order and the impending commitment of appellant are sufficient restraints to meet the "in custody" requirement of the federal habeas corpus statute. United States ex rel. Rybarik v. Maroney, 406 F.2d 1055, 1056 n. 1 (3d Cir. 1969). *See also*, Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed. 2d 285 (1963).

[footnote omitted] it must hew to federal constitutional criteria in ensuring that the selection of membership is free of racial bias. [footnote omitted]. . . ." Carter v. Jury Commission of Greene County, supra, 396 U.S. at 330, 90 S.Ct. at 523.

■ When one is willing to serve, and deemed fit by the state to serve,[4] he cannot be excluded by the consideration of unacceptable or improper criteria. If such exclusion takes place, depriving a defendant of members of his or her race,[5] sex,[6] or economic class,[7] then there may be a denial of equal protection.

■ The need of a cross-section of the community on a grand jury is particularly important because of its unique functions in the judicial process. On the one hand, that "body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will." Wood v. Georgia, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962). On the other, it serves to investigate wrong-doing and invoke the judicial process against those who have broken society's laws. United States v. Neff, 212 F.2d 297, 301 (3d Cir. 1954). Although a state need not provide a grand jury, Hurtado v. California, 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232 (1884), it cannot proceed with one that was discriminatorily selected. Such discrimination, once begun, fatally infects all subsequent proceedings against those who have been denied the equal protection of the laws. Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958); Hernandez v. Texas, 347 U.S. 475, 482, 74 S.Ct. 667, 98 L.Ed. 866 (1934); Akins v. Texas, 325 U.S. 398, 401–402, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945).

## II. THE "KEY MAN" SYSTEM

The "key man" system, which is the focus of this appeal, was the product of the latitude given the New Jersey Jury Commissioners in the selection of their jury lists. The state's statutes set forth qualifications for jurors, N.J.S.A.

4. All of the groups appellant contends are under-represented are required to serve as jurors in New Jersey, N.J.S.A. 2A:69-1 and 2A:72-7. However, this broad spectrum of jurors has not been required by the Supreme Court, and the states may make reasonable classifications limiting jury service. Hoyt v. Florida, 368 U.S. 57, 62, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961).

5. See, e. g., Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 859 (1950); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947).
A white man may also object to the exclusion of Negroes from state grand or petit juries. Peters v. Kiff, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83.

6. Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women illegal under federal jury selection scheme and proscribed under Supreme Court's supervisory power over the federal courts). But see, Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961).

7. Thiel v. Southern Pacific R. Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (wage earners cannot be barred from federal juries); cf. Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967) (where state requires that members of the working class serve on juries, they cannot be eliminated through granting of large numbers of hardship excuses, particularly where their exclusion also leads to extreme limitations on the number of Negroes who can serve).

2A:69–1,[8] and exemptions from service, N.J.S.A. 2A:69–2 to 4,[9] and preclude any discrimination in selection based on race, color, creed, national origin or ancestry. N.J.S.A. 2A:72–7. But, the method by which the jury commissioners arrive at the list of qualified names they are required to produce under N.J.S.A. 2A:-70–1 [10] has, until recently,[11] been left to their discretion. State v. Forer, 104 N.J. Super. 481, 250 A.2d 431 (1969); State v. Grundy, 136 N.J.L. 96, 54 A.2d 793, 796–797 (1947).

Prior to 1962, the Jury Commissioners of Essex County has been fulfilling their duties by drawing names from the county voting list. That year, the Assignment Judge for Essex County determined that the system was not working. He found that it did not produce enough Negroes, women, working class persons, or people from the City of Newark. He ordered the inclusion of such people, and the jury commissioners switched their method of selection to accommodate his wishes.

The theory of the "key man" system they adopted was to find strategically located persons in the county who could suggest capable people for jury duty. Theoretically, by selecting key men located in all the different communities in Essex County, and by taking into account appropriate economic and demographic factors, the key man system was intended to produce well qualified indi-

8. N.J.S.A. 2A:69–1 reads: "Every person, male and female, summoned as a grand juror, and every petit juror returned for the trial of any action of a civil or criminal nature in any of the courts of this State, shall be a citizen of this State for at least 2 years; over 21 and under 75 years of age; a resident of the county from which he shall be taken; shall not have been convicted of a crime; and shall not, at the time of his selection, be a person who through his office, position or employment is either directly or indirectly connected with the administration of justice. Such person shall be able to read, write and understand the English language and shall not have any mental or physical disability which will prevent him from properly serving as a juror."

9. Most of the exemptions from jury service are contained in N.J.S.A. 2A:69–2, which in 1967 included the following significant categories:
   "The following persons shall be exempt from service on any panel of grand or petit jurors:
   a. Members or employees of police forces, State or local.
   b. Members of any fire department or fire patrol, volunteer or paid.
   .   .   .   .   .
   d. Regularly licensed and practicing physicians and dentists in this State.
   e. Members of State or Federal military, naval or air forces   .   .   .
   f. School teachers   .   .   .
   g. Any person who has the actual physical care and custody of a minor child and who gives written notice to the jury commissioners of the county of his residence that jury service would interfere with the care required for such child.
   .   .   .   .   .
   i. Telegraph and telephone operators and linemen   .   .   ."
   N.J.S.A. 2A:69–3 permits certain juries not to be selected from the jury lists, and N.J.S.A. 2A:69–4 exempts from jury service those who have served as grand or petit jurors within the past year.

10. N.J.S.A. 2A:70–1 reads, in part, as follows:
   "The jury commissioners of each county shall   .   .   .   make 2 lists, alphabetically arranged and consecutively numbered, of persons liable to jury duty, having regard to the just distribution of jury service among those persons qualified therefor in the various wards and municipalities,   .   .   .   and shall be designated respectively the 'grand jury list' and the 'petit jury list.' The number of persons named on the grand jury list shall at no time be less than 125 nor more than 300, to be determined by the assignment judge of the Superior Court for the county   .   .   ."

11. On March 7, 1969, subsequent to the events in this case, Chief Justice Weintraub of the New Jersey Supreme Court directed that "in the future the grand jury lists be selected in the same manner and from the same pool of names, as petit jurors." State v. Rochester, 54 N.J. 85, 253 A.2d 474, 477 (1969). This decision was in response to the growing dissatisfaction with non-random selection of grand jurors, particularly through the use of a key man system.

viduals of all races, classes and communities for service on the grand jury.

However, the key man system in Essex County was not an effective system.[12] The jury commissioners had no settled method for selecting their key men. It was haphazard and uncertain at best, with absolutely no restraint on the subjective judgment of the jury commissioners. During the period from 1962–64, the Commissioners attempted to correct the lack of Negro names and solicited juror recommendations from some Negroes, including two judges and the director of the Newark Urban League, as well as from civic organizations and other people in the county. This special appeal produced about 250 Negro names. One Commissioner, however, conceded at the hearing in this case that the special effort soliciting Negro names was not continued after 1964. The names that were the fruits of this special effort were exhausted by 1966–67 when the events in question took place.[13]

At least one of the jury commissioners testified he did not know the size of the component parts of the county's population, and that he had no idea what type of grand jury list his work was producing. This lack of knowledge exacerbated the problems with the key man system. Such conduct was in dereliction of the responsibilities that courts have required jury commissioners to take under the equal protection clause in order to provide a reasonable cross-section. Carter v. Jury Commission of Greene County, supra; Carmical v. Craven, 457 F.2d 582 (9th Cir. 1971). It is also particularly disturbing in view of the affirmative action incumbent upon the jury commissioners following the Assignment Judge's 1962 order. Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); James v. United States, 416 F.2d 467 (5th Cir. 1969), cert. denied 397 U.S. 907, 90 S.Ct. 902, 25 L.Ed.2d 87 (1970); Brooks v. Beto, 366 F.2d 1 (5th Cir. 1966), cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967), rehearing denied, 386 U.S. 1043, 87 S.Ct. 1489, 18 L.Ed.2d 618 (1967). Thus, this inaction was an abdication of an important element of a jury commissioner's role when it was patent that only careful tuning and retuning of the key man system would result in appropriate representation.

The Jury Commissioners apparently realized the inadequacy of their procedure because they asked the Chief Clerk of their office to use the petit jury list drawn from the voting list to add names of people from *Newark*, the city with the largest Negro population in the county, to the grand jury list.[14] This

---

12. The federal judicial system has recognized the problems with the key man system and done away with it as a method of selecting federal grand and petit juries. Report of the Committee on the Operation of the Jury System, 42 F.R.D. 353, 360–61 (1967). *See also*, H.R. 1076, 90th Cong.2d Sess., The Jury Selection and Service Act of 1968, 1968 U.S.Code, Cong., and Admin.News pp. 1792, 1794. P.L. 90–274, 82 Stat. 53, 28 U.S.C. § 1861 et seq. (1970).

13. One of Essex County's Jury Commissioners, Melvin Howie, testified that he thought that in 1966–67 grand juror selection was done solely from voting lists. (N.T. 366). However, Concetta Toscano, head clerk of the Jury Commissioners' staff, testified repeatedly that during 1966–67 each grand jury list was made up primarily from lists of names submitted by the Jury Commissioners. (N.T. 470–94). The judge who presided at the hearing found that the "key man" system was in fact in operation in 1966–67, 246 A.2d at 46, and the State of New Jersey so concedes in its brief to this court. (Appellee's Brief, at 6).

14. This supplementation generally amounted to between five and twenty names (N.T. 489), so that almost all the names were submitted by the Jury Commissioners or were drawn from prior grand jury lists whose members had not served. (N. T. 474).

After the initial list was assembled, questionnaires were sent out by the clerk's office to those on the list. Those who did not reply or who were exempted from jury service under the statute, were not put on the list. (N.T. 472, 482–85). While there is no direct testimony on the

supplementation raises at least the inference that the Jury Commissioners knew the key man system was operating ineffectively.[15]

This haphazard system produced significant under-representation of Negroes. Appellant first attempted to show that as a mathematical probability it was impossible for so few Negroes to show up on a grand jury list absent discrimination. While such information may lend credibility to an over-all presentation, statistical improbabilities are not sufficient to establish a prima facie case. Alexander v. Louisiana, 405 U.S. 625, 629, 92 S.Ct. 1221, 1268, 31 L.Ed.2d 536 (1972); Whitus v. Georgia, 385 U.S. 545, 552 n. 2, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).[16] However, the same figures illustrate the kind of significant under-representation which is required for appellant's prima facie case. The Essex County key man procedure from May 1966 to May 1967 produced four separate, consecutive grand jury lists of 300 people each of which had only an average of 6% Negro names. By contrast, the county was approximately 25% Negro at that time.[17]

These figures are as serious as the disparities disapproved by the Supreme Court in recent cases. In Alexander v. Louisiana, supra, 405 U.S. 625, 627, 92 S.Ct. 1221, 1223, the selection procedure produced a grand jury venire that was 6.75% Negro in a county with 21% Negro population. Turner v. Fouche, supra, found inadequate representation when 37% of the grand jury list was Negro in a county with 60% Negro population. While the parties in this case have quibbled over how this court should interpret

question, the number of people so excluded from the grand jury list does not seem to have been significant, and does not explain the low representation of Negroes.

15. This supplemental procedure and the general selection of the petit jury lists is potentially suspect because the Jury Commissioners persisted in using the voting lists after they were told by the Assignment Judge that the lists were not producing a cross-section of the community. While it is one thing to use a random selection procedure on the good faith assurance that it will produce a cross-section of the community, it is a far different problem if the facts reveal that the Jury Commissioners persisted in using that method when they knew it was not going to produce the requisite cross-section. Such a set of facts, if proved, might well raise a question of a denial of equal protection. See Broadway v. Culpepper, 439 F.2d 1253, 1257 (5th Cir. 1971); King v. Cook, 298 F.Supp. 584 (N.D.Miss.1969).

16. Appellant's statistician stated that the likelihood of having only 6% of a grand jury made up of Negroes was less than one in one million if the county's Negro population was approximately 27%. Even assuming the actual Negro population was smaller than that, reducing the statistical improbability, we doubt that there was much difference between this case and Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972) and Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), in which petitioners showed that the statistical probability of grand venires with the proven percentage of Negroes was less than one in 20,000.

While we agree with the Superior Court that the use of statistics in equal protection cases can be misleading, they do serve a useful purpose in pointing up potential problems which require some kind of explanation. See generally, Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination Cases, 80 Harv.L.Rev. 338 (1966).

17. The Superior Court relied on a figure of 17% Negroes in the Essex County population, 246 A.2d at 49. However, this figure, which was based on the 1960 census, is in considerable dispute and would seem to be inaccurate. A projection of population growth made by the New Jersey Department of Conservation and Economic Development estimated that in 1966, 27.3% of Essex County was Negro. (Appellant's Appendix 50a, Exhibit D–31). At the habeas corpus hearing, the 1970 census figures, showing Negroes making up about 30% of the county's population, were introduced by appellant. (Appellant's Appendix 49a) Taking into account the various inaccuracies in estimating an appropriate figure, we believe a 25% figure is justified.

such percentage diminution,[18] significantly, approximately three-quarters of the adults in a segment of the community numbering approximately 260,000 at the time in question seem to have been excluded from consideration for jury service. "In the face of the commissioners' unfamiliarity with Negroes in the community and the informality of the arrangement by which they sought to remedy the deficiency in their knowledge upon recompiling the jury list, we cannot assume that inquiry would not have led to the discovery of many [more] qualified Negroes." Turner v. Fouche, supra, 396 U.S. at 360, 90 S.Ct. at 540.

However, the disparity between population and jury representation is not the sole consideration in this litigation. The Supreme Court's most recent jury discrimination decision, Alexander v. Louisiana, supra, reaffirmed the conclusion reached in Swain v. Alabama, supra, that under-representation alone was not sufficient to show a prima facie case of discrimination.[19] *Alexander* required that there be an opportunity for racial discrimination, 405 U.S. 625, 92 S.Ct. 1221. The parties vigorously dispute whether the key man system offered the opportunity for racial discrimination contemplated by the Supreme Court.

The State of New Jersey contends essentially that one general principle which can be abstracted from all relevant Supreme Court decisions is that each fact situation included a specific step when the jury commissioners could look at a list, or at a man's face, to separate people on the basis of race and produce a monochromatic list. Because that opportunity is not present here, the state asserts no opportunity to discriminate exists. We disagree.

The state is correct in asserting that the Supreme Court's cases have almost invariably faced instances of direct discrimination potentially designed to exclude Negroes. For instance, Alexander v. Louisiana, supra, is paradigmatic of the recent cases which have confronted improper exclusion of Negroes from jury service.[20] In *Alexander* the jury

---

18. Appellant has argued that percentage diminution should be assessed on a comparative rather than absolute basis. See, parative rather than absolute basis. *See,* e. g., Alexander v. Louisiana, 405 U.S. 625, 630, 92 S.Ct. 1221–1225, 31 L.Ed.2d 536 (1972). In other words in this case, in which the Negro population in the county was approximately 25% and representation on the grand jury list approximately 6%, appellant would argue that there is 76% under-representation rather than 19% under-representation. On this basis, he would conclude that the under-representation is more serious than, for instance, in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), in which the county's Negro population was 60%, but grand jury representation 37%. That absolute difference, 23%, is larger than the disparity in Essex County, but comparatively, it is only a 38% diminution, which is smaller than the Essex County figure.

However, the comparative approach reaches absurd results in cases like Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414 (3d Cir. 1955), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L. Ed. 842 (1956), which considered racial discrimination in the Western District of Pennsylvania, where the Negro population at the time was 4.4% of the total, and Negro jury participation ranged as low as 2% of the jury list.

These problems with comparing statistics illustrate the utility of presenting some probability analysis along with the actual percentages.

19. The 5th Circuit has stated that it will rely on the objective results of the jury selection procedure for plaintiff's prima facie case. Ford v. White, 430 F.2d 951, 954 (5th Cir. 1970). However, whether that means that court will not look at various forms of procedural defects in deciding the merit of the prima facie case is doubtful. *See, e. g.,* Broadway v. Culpepper, 439 F.2d 1253 (5th Cir. 1971).

20. *See, e. g.,* Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970) (jury selection required commissioners to eliminate all potential jurors who were "unintelligent" or not "upright citizens," and commissioners failed to ascertain any information about other potential jurors who were unknown to them) ; Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970) (jury commissioner to prepare a

commissioners selected names of potential jurors from a variety of sources and then mailed out questionnaires. The questionnaires included a space for indication of race. When these were returned, the commissioners culled from the pile those people who were either unqualified or exempt from service. Finally, they selected "at random" names for the grand jury venire.

■ However, these facts do not delineate the breadth of those decisions. The Supreme Court requires those who select jury panels to follow a procedure —a course of conduct—which does not operate to discriminate in the selection of jurors on racial grounds. Avery v. Georgia, 345 U.S. 559, 561, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); Hill v. Texas, 316 U.S. 400, 414, 62 S.Ct. 1159, 86 L. Ed. 1559 (1942). The opportunity to discriminate as required for a prima facie case of discrimination is shown when a party:

> demonstrate[s] that the disparity originated, at least in part, at the one point in the selection process where the jury commissioners invoked their subjective judgment rather than objective criteria. Turner v. Fouche, supra, 396 U.S. at 360, 90 S.Ct. at 540.

■ The opportunity to discriminate in *Alexander* occurred because the jury commissioners had the ability to invoke such subjective selection. The possibility of identifying each potential juror only provided the factual information on which the tainted subjective decision could be based. Decisions rendered by other courts of appeals make clear that the opportunity to discriminate by the exercise of subjective judgment which can in some way consider race is sufficient in conjunction with the requisite under-representation to make a prima facie case.

In Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967), the 5th Circuit concluded that the systematic granting of excuses to day laborers in New Orleans Parish was discriminatory. There was no general state policy in favor of systematically excluding day laborers, and the court found the exercise of the jury commissioner's subjective judgment unacceptable since it was common knowledge that a large percentage of all day laborers in the Parish were Negro. The inability to match individual jurors and their race was unimportant so long as the effect of the system was to produce a significant constant under-representation of Negroes.

More recently, the 9th Circuit has held that the administration of inaccurate intelligence tests that eliminated disproportionate numbers of Negroes from the jury rolls in Alameda County, California, was a violation of a defendant's right to equal protection. Carmical v. Craven, supra. This decision amply illustrates that there need be no direct discrimination against individual jurors. It was a sufficient exercise of discretion for the jury commissioners to select a test which the state conceded did not test intelligence and which was culturally biased against members of minority groups.[21]

list of persons of good moral character and sound judgment whom they deemed well qualified to serve as jurors); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (the last three cases all concern the selection of juries from tax digests which at least in part listed the taxpayer's race).

21. A recent case which upheld the constitutionality of a jury selection system in spite of a substantial under-representation of Negroes, Puerto Ricans, and the poor is United States ex rel. Chestnut v. Criminal Court of City of New York, 442 F.2d 611 (2d Cir. 1971), cert. denied, 404 U.S. 856, 92 S.Ct. 111, 30 L.Ed.2d 98 (1971). New York County's voluntary grand jury service law did not give any state official an opportunity to discriminate as contemplated in Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The petitioner in that case conceded not only that there was no purposeful discrimination but al-

In addition, the State of New Jersey has contended that there must be a showing of deliberate discrimination in making out a prima facie case but there is no support for that view. While actual animus against Negroes will obviously be an element in establishing a prima facie case, Carmical v. Craven, supra, 457 F.2d at 588, the issue of good faith need not enter into consideration. Protestations of such good faith will not aid the state in discharging its burden, Alexander v. Louisiana, supra, 405 U.S. at 631, 92 S.Ct. at 1225; Whitus v. Georgia, supra, thereby making the issue of motive or intent irrelevant in assessing a challenge to the jury selection system.

This case reveals an equivalent opportunity for racial discrimination. There is an unavoidable inference that certain key men were much more likely to produce names of whites, while others were more likely to produce names of Negroes. Further, the actions of the Jury Commissioners indicate that they obviously knew that Negro key men and Negro organizations were the source of most Negro names. Their failure to continue to pursue such sources after 1964 amounts to an elimination of the only significant source of Negro grand jurors in Essex County. Whether such conduct was intentional or simply negligent, its results were reasonably foreseeable to jury commissioners if they were exercising due diligence in the conduct of their duties. Moreover, the discontinued use of Negro key men was in direct contravention of the Assignment Judge's order to produce a more balanced grand jury list. Although the commissioners were not responsible for the racial division of society in Essex County, they were at least responsible for considering it when they chose a method to select jurors.

We hold, therefore, that the appellant in this cause of action has made out a prima facie case of a denial of equal protection.

The situation in Essex County is closely analogous to the jury selection procedures challenged in Salary v. Wilson, 415 F.2d 467 (5th Cir. 1969). The court noted that the problem with that selection system probably arose from the failure of the key men to supply adequate numbers of Negro names. As in the instant case, there was no direct discrimination by the commissioners themselves. However, that was not a sufficient answer. The court held that they had an affirmative duty to provide a representative cross-section of the community for jury service; and they could not shift the responsibility to the key men.

The State of New Jersey argued at the hearing in this case that the disparity between the overall Negro population and the number on the grand jury lists must be approached warily because it does not take into account the various disqualifications and disabilities, to which the Negro community is more vulnerable than the white community. However, the state adduced scant evidence on the issue, and presented nothing to dispel the serious questions of discrimination raised with regard to the key man system. As the 5th Circuit held in *Salary*, the failure of the white key men and major civic organizations to produce Negro names did not rebut a prima facie case of discrimination. Therefore, in the absence of evidence to the contrary, we must assume that there are qualified Negroes available for jury service. Alexander v. Louisiana, supra, 405 U.S. 536, 92 S.Ct. 1221; Turner v. Fouche, supra, 396 U.S. at 360, 90 S.Ct. 532. On this record, "there is no room for inference that there are not among [the Negro population] householders of good moral character, who can read and write, qualified and available for grand jury service." Hill v. Texas, 300 U.S.

so that there was no exclusionary device employed. Once the process began at no point was there an elimination of potential jurors through a step controlled by the subjective judgment of the jury commissioners.

400, 404, 62 S.Ct. 1159, 1161, 86 L.Ed. 1559 (1942). Accord, Cassell v. Texas, supra, 339 U.S. at 289, 70 S.Ct. 629, 94 L.Ed. 839; Patton v. Mississippi, 332 U.S. 463, 468, 68 S.Ct. 184, 92 L.Ed. 76 (1947).

■ Although a jury commissioner has a thankless, underpaid job,[22] often done out of a sense of civic responsibility, he cannot perform his duties wholly oblivious to his responsibilities. He is charged with producing a cross-section of the community the state deems appropriate for jury service. It is a necessary consequence of that responsibility that he know the population which comprises his community. In the absence of a randomized procedure, he must conform his method of selection to a system that will produce jury lists reasonably approximating that cross-section. When such a cross-section is not produced, and the circumstances offer an opportunity for discrimination, it is then his burden to justify his inability to fulfill his duties.

While a jury selection system without racial consideration is much to be desired, the realities of the present, however, cannot be ignored. For the moment, only appropriate consideration of race can correct racial imbalance. Turner v. Fouche, supra; James v. United States, supra.

The appellant has established at least a prima facie case. The state has failed to rebut it. The grand jury impanelled on the basis of such a procedure did not meet constitutional standards for equal protection and the indictment it returned against appellant should have been dismissed. The subsequent conviction by the petit jury therefore cannot stand.

The judgment of the lower court will be reversed and the case will be returned to the district court for proceedings not inconsistent with this opinion.

22. A jury commissioner's salary in Essex County in 1967 was $900, N.J.S.A. 2A:-68–7. The only qualifications for the post of jury commissioner are that the person not hold any other public office (except that of sheriff) and not be licensed to practice law in New Jersey. A county's two jury commissioners cannot be of the same political party. N.J.S.A. 2A:68–1.