UNITED STATES of America, Appellee,

v.

**Wilbur HOBBY, Appellant.**

UNITED STATES of America, Appellee,

v.

**Mort LEVI, Appellant.**

Nos. 82–5143, 82–5144.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 12, 1982.

Decided March 9, 1983.

---

Shelley Blum, Charlotte, N.C., Thomas C. Manning, Raleigh, N.C. (Cheshire, Manning & Parker, Raleigh, N.C., on brief), for appellants.

Janis H. Kockritz, U.S. Dept. of Justice, Washington, D.C. (Samuel T. Currin, U.S. Atty., Raleigh, N.C., on brief), for appellee.

Before HALL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

Wilbur Hobby and Mort Levi were convicted of conspiring to defraud the United States of funds appropriated under the Comprehensive Employment and Training Act in violation of 18 U.S.C.A. §§ 371 and 665. In addition, Hobby was convicted of misapplying or obtaining by fraud monies granted under CETA in violation of § 665, while Levi was convicted of hiring ineligible persons for training in a program established with CETA monies in violation of § 665. Each was sentenced to imprisonment and now appeals his conviction.

I.

Wilbur Hobby was president of the AFL–CIO in North Carolina and owner of Preci-

sion Graphics, Inc., a printing company located across the street from the union office. He had involved himself many times with CETA projects,[1] and in one of those projects he had worked with Mort Levi.[2] The union had need of computer services in its daily business, and typically such services were obtained by contracting with outside companies. Hobby conceived the idea that he might provide such services through the acquisition of a minicomputer compatible with the national union's big computer.

In January 1979, Hobby began discussions with a representative from Mohawk-Data Sciences about acquiring a computer for union work. Over the next two to three months, discussions about what equipment was necessary continued. In the meanwhile, however, Hobby and Levi formed a new company, Precision Data, Inc. Levi was shown on the articles of incorporation as an incorporator and also was listed as registered agent. Hobby owned 95% of the corporation's stock and was its president.

In February 1979, the newly formed corporation, Precision Data, submitted to the North Carolina Department of Natural Resources and Community Development a CETA grant request for funds to train data processing personnel. The application was received with skepticism, both because of doubt of the need of another such program in that vicinity and because Precision Data had no staff, capital, plant or experience in computer training. The director of the Division of Community Employment of NRCD suggested that the contract be awarded to Precision Graphics because of its previous experience with CETA contracts. Levi met with two NRCD employees and drafted a new CETA application on behalf of Precision Graphics.

On May 21, 1979, the application of Precision Graphics for a grant of $129,429 was placed on NRCD's authorization list.

Meanwhile, in April, Hobby, on behalf of Precision Data, had contracted to purchase a computer from Mohawk. The purchase price was $41,317.68, to be paid with a down payment of $10,329.42 and twenty-four equal monthly installments of $1,721.57. In addition, Precision Data agreed to pay Mohawk $214 a month for maintenance.

On the same day that the application of Precision Graphics was placed on the contract authorization list, in a contract signed by Hobby, Precision Graphics agreed to lease Precision Data's computer for a monthly rental of $3,000 and a maintenance fee of $500 a month.

In late May, a CETA contract with Precision Graphics was signed and an advance of $43,696, requested by Levi, was paid. Almost immediately thereafter Hobby transferred $18,000 from the account of Precision Graphics to the account of Precision Data to cover a check he had earlier drawn on the computer. The $18,000 check was said to be "$9,000 for transportation and $9,000 for computer rental." In early July, Hobby wrote another check from Precision Graphics to Precision Data as payment for computer rental, this one for $5,000. Thus, notwithstanding that the computer was not even in place until June 15, Precision Graphics expended and Precision Data received for the audit period beginning May 21 and ending September 30, 1979, $14,000 for computer rental.[3] Moreover, Precision Graphics paid Precision Data for computer maintenance at the rate of $500 a month beginning May 21, though Precision Data's obligation to pay Mohawk for such services did not begin to run until July 16, 1979, and then only at the rate of $214 a month.

The largest diversion of funds, however, occurred in connection with charges for the transportation of students. Almost $28,000 was charged to Precision Graphics by Precision Data for services that never were provided.

---

1. In all Hobby had signed 15 CETA contracts between early 1977 and late 1979.

2. During one of Hobby's CETA funded printing training programs in 1978–79, Hobby paid Levi $2,500 for "curriculum committee support."

3. The contract subsequently was extended for six weeks to mid-November, but the events that occurred after September 30 were not addressed in the audit nor are they relevant to this appeal.

Levi recruited the students, and had a number of ineligible students falsify statements to make them appear eligible.

Beginning in late August, a supervisor of an "Independent Monitoring Unit" in NRCD began to monitor Precision Graphics' CETA contract. When she and other employees of NRCD sought to meet with Hobby and Levi, they were rebuffed by Levi, and later Hobby refused them free access to books and records and other materials they needed. Finally, in late September the Secretary of NRCD requested an audit by the state auditing office. It produced a report released in May 1980.

## II.

Hobby urges reversal on fourteen separate grounds. Levi makes three points which parallel three of Hobby's. Most of the contentions are of little substance or frivolous, and only two seem to us to deserve discussion.

## A.

■ Three counts of the indictment charged Hobby with having procured CETA funds by fraud *and* diverting such funds for (1) purchase of data processing equipment, (2) the rental of such equipment, and (3) the maintenance of such equipment. The charge was in the conjunctive, though the statute, 18 U.S.C.A. § 665, is in the disjunctive. The statute is violated if the CETA funds are obtained by fraud or if they are diverted or misapplied. Hobby obtained a preliminary instruction, to which the United States did not object, stating both the statutory prongs in the conjunctive so the prosecution would be required to prove both fraud in obtaining the grant *and* misapplication of the funds. In his final instructions to the jury, however, the district judge properly charged the statutory offense stating the two prongs in the disjunctive. This, Hobby contends, was a deprivation of his right of due process since his lawyer had been led to believe that he could obtain an acquittal upon a finding of no fraud in obtaining the grant, regardless of any later misapplication.[4]

If we assume that defense counsel was misled by the prosecution and that the government had the burden of proving beyond a reasonable doubt fraud in obtaining the grant and misapplication of the funds, we can perceive no consequential prejudice to Hobby. Evidence of fraud in obtaining the grant and the misapplication of granted funds was derived from the records of the two corporations, Precision Graphics and Precision Data, the CETA applications, testimony relating to those documents and records and to events associated with them. The same core of operative facts forms the basis for finding fraud or misapplication, or both. Indeed, the two things were closely interrelated, for what Hobby did with the money tended to show both misapplication and fraud in obtaining the funds. Hobby admits that the allegation of fraud was the focus of his defense, and in making that defense he necessarily was required to do all that he could to explain and justify the expenditures. Counsel did not suggest what more he might have done in defense of the charge of misapplication of the funds. We cannot conceive of anything that might have been done that was not done.

The principle upon which Hobby relies is not without support. In *United States v. San Juan,* 545 F.2d 314 (2d Cir.1976), a woman was convicted of bringing into the United States a large sum of currency without having declared it. She crossed the border from Canada in a bus, and, at trial, the prosecution insisted that the offense was committed while the defendant was on the bus during inquiries by Customs agents and undertook the burden of proving its

---

**4.** We doubt that defense counsel was misled. It is true that the indictment charged the matter in the conjunctive and, at Hobby's request, the district judge stated the matter in the conjunctive in his preliminary charge to the jury. The lawyer also points to the government's response to a pretrial motion in which at one place the two offenses appear in the conjunctive, but that followed a disjunctive statement clearly tracking the language of the statute. It would be supposed that the lawyer had read the statute and knew its provisions.

case on that basis. When the trial judge submitted the case to the jury, however, it instructed that they might convict on the basis of events that occurred after the plaintiff had been removed from the bus and escorted into the Customs House. The Court of Appeals decided there had been a deprivation of due process since the prosecution had provided defense counsel with abundant reason to believe that he could and should focus his defense on the events and occurrences on the bus. We accept the principle, of course, but *San Juan* is not this case. Proof of both branches of the offense were found in the corporate books and records, fully explored by the audit. The audit revealed discrepancies that were the basis for finding acquisition of the CETA money by fraud and the misapplication of some of those monies. In this case it cannot be said that defense counsel directed his efforts at a different set of facts from those that became the basis for his client's conviction.

### B.

Each of the defendants sought dismissal of the indictment on the basis of alleged discrimination in the selection of grand jury foremen in the Eastern District of North Carolina. They produced evidence that in the years 1974–1981 no black had served as the foreman of the grand jury in that district, and no woman.

There is no contention of discrimination in the selection of the grand jury. They were selected under an approved plan designed to insure fair representation of blacks and of women. The contention is simply that in those years no judge had designated a black or a woman to act as foreman.[5]

In the context of a state grand jury, this question was presented to the Supreme Court in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). The Su-

preme Court, however, found it unnecessary to decide whether or not a reversal of the conviction was required upon a showing of discrimination in the selection of grand jury foremen, for it found an insufficient showing of any such discrimination.

In *Guice v. Fortenberry,* 661 F.2d 496 (5th Cir.1981) (*en banc*), the court held that discrimination in the selection of a foreman of a state grand jury required vacation of the conviction just as would a taint affecting the selection of all of the grand jurors. The Eleventh Circuit, in *United States v. Perez-Hernandez,* 672 F.2d 1380 (11th Cir. 1982), came to the same conclusion, though the case involved discrimination in the selection of the foremen of federal grand juries.[6]

■ The question which the Supreme Court deliberately did not decide in *Rose v. Mitchell* was much more debatable than the one with which we are confronted. Involved there was alleged discrimination in the selection of grand jury foremen in Tennessee. In that state the foreman was selected by the judge from the eligible population at large, not from just those drawn to serve. He serves a two-year term, during which he has considerably more authority than that of the presiding officer. He is authorized to assist prosecutors in investigating crime and to order the issuance of subpoenas to witnesses. An indictment is fatally defective unless it bears the foreman's signature. 443 U.S. at 548 n. 1, 99 S.Ct. at 2996 n. 1.

■ The foreman of a federal grand jury is selected after the grand jury has been impaneled from among those who have been impaneled. His only duties are ministerial. He has no special powers or duties, beyond those borne by every grand juror, that meaningfully affect the rights of persons charged with crime. The failure of

---

**5.** We are informed that since the grand jury indicted Hobby and Levi there have been black grand jury foremen in the Eastern District of North Carolina.

**6.** Similar problems have been presented to other courts. *See, e.g., Williams v. Mississippi,*

608 F.2d 1021 (5th Cir.1979); *United States v. Cross,* 516 F.Supp. 700 (M.D.Ga.1981); *United States v. Manbeck,* 514 F.Supp. 141 (S.C.1981); *United States v. Holman,* 510 F.Supp. 1175 (N.D.Fla.1981); *United States v. Jenison,* 485 F.Supp. 655 (S.D.Fla.1979).

a federal grand jury foreman to carry out those ministerial duties placed upon him by F.R.Cr.P. 6(c) generally will not invalidate an indictment. *See, e.g., Frisbie v. United States,* 157 U.S. 160, 15 S.Ct. 586, 39 L.Ed. 657 (1895).

The impact of the federal grand jury foreman, as distinguished from that of any other grand juror, upon the criminal justice system and the rights of persons charged with crime is minimal and incidental at best. Any suspicion that his office may enlarge his capacity to influence other grand jurors is too vague and uncertain to warrant dismissal of indictments and reversals of convictions.

The roles of grand jury foremen in the federal system differ substantially from the roles of grand jury foremen in Tennessee and other states. Federal grand jury foremen are without the significant powers authorized for Tennessee grand jury foremen. Their role is so little different from that of any other grand juror that the rights of defendants are adequately protected by assurance that the composition of the grand jury as a whole cannot be the product of discriminatory selection.

We respectfully disagree with the contrary conclusion of the Eleventh Circuit in *Perez-Hernandez.*

### III.

Finding no merit in any of the other contentions of the defendants, their convictions are affirmed.

AFFIRMED.