197 N.J. Super. 565 (1984)
485 A.2d 708
STATE OF NEW JERSEY
v.
THOMAS RAMSEUR.
Superior Court of New Jersey, Law Division Essex County.
Decided August 2, 1984.
*570 Hilary L. Brunell, Assistant Essex County Prosecutor, for plaintiff (George L. Schneider, Essex County Prosecutor, attorney).
David Kairys of the Pennsylvania Bar admitted pro hac vice and Roger Solomon, Assistant Deputy Public Defender, for defendant (Joseph H. Rodriguez, Public Defender of the State of New Jersey, attorney).
NEWMAN, J.S.C.

I. INTRODUCTION
Defendants, Thomas Ramsuer et als. bring this motion seeking the reversal of convictions and/or dismissal of indictments based upon their claim that they were indicted and tried by grand and petit juries drawn from improperly constituted venires. This motion which challenges the jury selection system in Essex County began as a pretrial motion returnable before the Honorable David Baime, J.S.C. in the case of State of New Jersey v. Thomas Ramsuer, 183-82. Due to the complexity of the proofs necessary to pursue a plenary challenge to a jury system, this motion was bifurcated from the Ramsuer trial. During the course of the hearing the Public Defender's office sought and was permitted, to join in this motion, thirteen other defendants who are also charged with murder under N.J.S.A. 2C:11-3.[1]
*571 Defendants allege three separate defects in the Essex County jury selection system which they claim entitles them to the requested relief: (1) the juror source list and qualified pool are unconstitutionally unrepresentative; (2) the exclusion of blacks and women from the position of grand jury foreperson; and (3) the violation of New Jersey jury selection statutes.

II. THE JUROR SOURCE LIST AND QUALIFIED POOL

A. THE SELECTION PROCEDURE IN ESSEX COUNTY
Jurors in Essex County are selected from a source list comprised of a merged list of the county's registered voters and licensed drivers. Names appear on the source list alphabetically by municipality and street name, and numerically by house number. Jurors are randomly selected from the source list as needed. Random selection is accomplished by the systematic extraction of names from the list according to a predetermined fixed interval. The interval is arrived at by dividing the number of names on the list by the number of questionnaires that the jury commission sends out. The computer uses the interval to select names from the whole list which guarantees the selection of jurors from each municipality and each street *572 without selecting more than one person from every household. Anyone who has served on a jury in the past seven years or has received a qualification questionnaire in the past four years is excluded from the selection process. The computer also keeps track of persons who are designated permanently or temporarily ineligible to serve by the jury commission.
The questionnaires are mailed to the prospective jurors who complete them and send them to the jury commission office where they are screened for eligibility. All those deemed eligible are re-entered into the computer. The interval method is used to select a qualified pool of grand jurors from the list of eligible jurors. Those who are not selected for grand jury service are designated to be petit jurors. The jurors on the lists of grand and petit jurors are then given random numbers and are sorted. Sorting the qualified lists consists of placing the jurors in an ascending sequence according to their random numbers.
An order is received from the assignment judge informing jury control of the number of panels, the number of people per panel, and the reporting date for each panel. The petit jury qualified list is divided into panels which conform to the order of the assignment judge. Each panel is divided into subpanels consisting of fifty jurors and then resorted listing the jurors alphabetically. The grand jury qualified list is divided into panels but these panels are left in random sequential order.

B. DEFENDANTS' CLAIMS
Defendants claim that an under-representation of constitutional proportions is revealed when the number of blacks, women, low income groups, young people, students and Newark residents found in the general population of Essex County is compared with the number of these groups which appear on the juror source and qualified lists for the May 1982 term. Defendants undertook to determine the race, sex, and economic status of jurors summoned for jury service by means of two *573 telephone surveys and a geographic inference analysis[2] of every juror on the May 1982 jury list. The results of these surveys were weighed and combined to determine the degree to which a particular group was represented in the Essex County jury selection system. These figures were then compared to the census bureau statistics for Essex County. A summary of the combined result of defendants' statistical evidence appears as follows:

 POPULATION POOL ABSOLUTE
 % % DISPARITY %[3]
 Blacks/qualified list 35.9 21.8 14.1
 Blacks/source list 35.9 21.3 14.6
 Women/qualified list 53.3 46.5 6.7
 Women/source list 53.2 47.2 6.0
 Urban/qualified list 36.6 20.9 15.7
 Urban/source list 36.6 27.4 9.2
 Low income/qualified list 50.0 37.8 12.2

*574 The defendants base their prima facie case upon these statistical disparities.[4]

C. THE LAW
Defendants pursue their challenge to the jury selection process under both the Equal Protection Clause to the Fourteenth Amendment and the Sixth Amendment to the United States Constitution as well as under Article I, pars. 5, 9 of the New Jersey Constitution (1947). In order to show that an equal protection violation has occurred in the context of a county's jury selection procedure, defendant must show that the procedure employed resulted in a substantial under-representation of an identifiable group. The prima facie case consists of a showing that a recognizable, distinct class has been singled out for different treatment under the law by its substantial under-representation in the jury system. See Castaneda v. Partida, 430 U.S. 482, 484, 97 S.Ct. 1272, 1275, 51 L.Ed.2d 498 (1977). Substantial under-representation is shown by a comparison of the proportion of the group in the total population to the proportion called to serve as jurors over a significant *575 period of time. Ibid. Implicit in the prima facie case of equal protection challenge is a showing of discriminatory intent. Duren v. Missouri, 439 U.S. 357, 368, n. 26, 99 S.Ct. 664, 670, n. 26, 58 L.Ed.2d 579 (1979). The statistical showing of a substantial under-representation for a significant period of time raises a presumption of discrimination. Once defendant has shown substantial under-representation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the state to rebut that case. Castaneda, 430 U.S. at 495, 97 S.Ct. at 1280.
In order to show that a Sixth Amendment fair cross-section violation has occurred, defendant must demonstrate:
(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury selection process. [Duren v. Missouri, supra, 439 U.S. at 364, 99 S.Ct. at 668.]
A Sixth Amendment challenge differs from a Fourteenth Amendment challenge in that the challenger need not prove purposeful or intentional discrimination. The Sixth Amendment challenge focuses upon the impact the jury selection system has on any particular cognizable group. Id. at 368, n. 26, 99 S.Ct. at 670, n. 26. The prima facie case may only be overcome by a showing "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process ... that result in the disproportionate exclusion of a select group." Id. at 367, 99 S.Ct. at 670. Although defendants claim their position is supported by an analysis under the Sixth Amendment, the Fourteenth Amendment, or state constitutional grounds, the thrust of their argument is directed toward a Sixth Amendment analysis of the Essex County jury selection system.

*576 D. THE SIXTH AMENDMENT CHALLENGE.

1. DISTINCTIVE GROUPS
Defendants have failed to show that Newark residents, young people, students and individuals characterized as having low income are distinctive groups in the community for the purposes of a Sixth Amendment cross-section challenge. Proof of a cognizable group, like the other prongs of the prima facie case, is a question of fact which must be affirmatively proven by the moving party. Hernandez v. Texas, 347 U.S. 475, 478, 74 S.Ct. 667, 670, 98 L.Ed. 866 (1954). To establish the existence of a "distinctive" or "cognizable" group, it is necessary to prove the following:
(1) The presence of some quality or attribute which `defines and limits' the group; (2) a cohesiveness of `attitudes or ideas or experience' which distinguishes the group from the general social milieu; and (3) a `community of interest' which may not be represented by other segments of society. [State v. Porro, 152 N.J. Super. 259, 267 (Law Div. 1977), aff'd 158 N.J. Super. 269 (App. Div. 1978), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); United States v. Test, 550 F.2d 577 (10 Cir.1976)].

a. NEWARK RESIDENTS
There is no evidence in the record which suggests that Newark residents hold distinctive attitudes or share a community of interest not found in other urban areas of Essex County. Without proof of the cognizability of Newark residents defendants' Sixth Amendment challenge must fail. Even if evidence of the cognizability of Newark residents were introduced, as a matter of law people of a particular city or town do not constitute a cognizable group for purposes of a Sixth Amendment cross-section challenge to a jury system. Zicarelli v. Dietz, 633 F.2d 312, 316 (3 Cir.1980), cert. den. 449 U.S. 1083, 101 S.Ct. 868, 66 L.Ed.2d 807 (1981); United States v. Foxworth, 599 F.2d 1, 4 (1 Cir.1979).

b. LOW INCOME
The geographically inferred method was utilized by defendants to classify as low income those jurors selected from areas *577 of Essex County which had a median income lower than the county median. Once again, defendants failed to offer any evidence that the class of people they designated as low income shared a community of interest and a cohesiveness of attitudes which distinguishes them from the rest of the community. For this reason, defendants' claim that their constitutional rights were violated because individuals with low incomes were systematically excluded from the jury system must fail.
Economic status has not been considered "a sufficiently meaningful classification of an identifiable group, or an appropriate class, to provide a basis for an attack to the array of grand jurors" in New Jersey. State v. Forer, 104 N.J. Super. 481, 490 (Law Div. 1969). In Forer, part of defendant's challenge to the selection process of grand jurors in Middlesex County was that "blue collar, hourly paid wage earners" were systematically excluded. The trial judge discerned the meaning behind the classification "blue collar, hourly paid wage earners" to be persons in the lower economic class. As such the court opined that low economic status did not succeed in classifying an identifiable group. Ibid.[5] Lower federal courts have also rejected using low income status as a limiting characteristic which creates a distinctive group in the community. See United States v. Greene, 489 F.2d 1145 (D.C. Cir.1973); United States v. Cabrera-Sarmiento, 533 F. Supp. 799 (S.D.Fla. 1982); United States v. Layton, 519 F. Supp. 946 (N.D.Cal. 1981).
Defendants cite Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) as authority for their position that people with low incomes constitute a cognizable group. However, defendants' expansive interpretation of the holding in Thiel is not supported by the facts of that case nor its subsequent discussion in Castaneda v. Partida, 430 U.S. 482, 97 *578 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The facts in Thiel concerned the jury selection process of a California state court which "deliberately and intentionally excluded from the jury lists all persons who work for a daily wage." Thiel, 328 U.S. at 221, 66 S.Ct. at 986. In condemning the intentional and systematic exclusion of "a very substantial portion of the community," the court held that "a blanket exclusion of all daily wage earners, however well intentioned and however justified by prior actions of trial judges, must be counted among those tendencies which undermine and weaken the institution of jury trial." Id. at 224, 66 S.Ct. at 987-88.
It is clear that the group contemplated by the court in Thiel was the class of daily wage earners. It should be equally obvious that this class is not synonymous with the class of low income residents of a particular vicinage. The cognizability of low income residents for the purpose of a Sixth Amendment cross-section challenge has not yet been decided by the Supreme Court. In Castaneda v. Partida, the Supreme Court was confronted with the issue of economic discrimination but found it "unnecessary to decide whether a showing of simple economic discrimination would be enough to make out a prima facie case in the absence of other evidence, since that case is not before us. Thiel v. Southern Pacific Co. (Citation omitted)." Castaneda, 430 U.S. at 492, n. 11, 97 S.Ct. at 1278, n. 11.
Therefore, this court concludes that the low income residents of the County of Essex do not present a cognizable group for the purpose of a Sixth Amendment cross-section challenge without a showing of some characteristic beyond economic status which could reasonably imply a community of interest and a cohesiveness of attitudes.

c. YOUNG PEOPLE
No evidence was offered and this court does not find young people to be a distinctive group for the purpose of this Sixth *579 Amendment challenge to the jury selection system. See United States v. Potter, 552 F.2d 901 (9 Cir.1977); United States v. Greene, 489 F.2d 1145 (D.C. Cir.1973); United States v. Layton, 519 F. Supp. 946 (N.D.Cal. 1981).

d. STUDENTS
Students do not "reflect any different political or social values than the cross-section of the population of the county" and therefore are not a cognizable group for the purpose of this Sixth Amendment challenge. State v. Porro, 158 N.J. Super. 269, 277 (App.Div. 1978), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); State v. Butler, 155 N.J. Super. 270, 271 (App.Div. 1978).

e. BLACKS AND WOMEN
Defendants have offered evidence that women and blacks have been systematically excluded from jury service. Women and blacks are cognizable groups for the purpose of a Sixth Amendment challenge to a jury selection system. Duren v. Missouri, supra; Castaneda v. Partida, supra. Defendants have therefore satisfied the first prong of their prima facie case for women and blacks.

2. THE DISPARITY
It is axiomatic that a defendant has a right to be tried before a jury selected from a venire which represents a cross-section of the community, see Taylor v. Louisiana, 419 U.S. 522, 527, 95 S.Ct. 692, 696, 42 L.Ed.2d 690 (1975); however, there is no constitutional requirement that the jury pool be a statistical mirror of the community. See Hoyt v. Florida, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961). The second prong of the prima facie case which must be shown by defendants is "that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of persons in the community." Duren, supra, 439 U.S. *580 at 364, 99 S.Ct. at 668. Although a challenge to a jury selection system is accompanied by reams of statistical evidence and complex mathematical formulae, it is not an exact science. No court has attempted to provide a formula or test which would determine what disparity represents an unreasonable representation for any given system. We are only provided with ranges of impermissible under-representation. Id. at 357, 99 S.Ct. at 664 (39.5% disparity for women impermissible); Castaneda, supra (40% disparity for Mexican-Americans impermissible); Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970) (23% disparity for blacks impermissible); Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (18.0% disparity for blacks impermissible); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (19.7% disparity impermissible).
The Supreme Court in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) stated that statistical disparities as much as 10% between identifiable groups in the community and their representation on jury venires does not imply purposeful discrimination. Id. at 208-209, 85 S.Ct. at 829-30. Since the Court in Swain declined to find a prima facie case of racial discrimination based on a showing that black males constituted 26% of the adult population and only 10-15% of the grand and petit jury venires, a literal reading of Swain places the permissible statistical disparity between 11-16%. In State v. Porro, 158 N.J. Super. 269, 280 (App.Div. 1978), the Appellate Division recognized that statistical disparities as much as 44% for Hispanics, 12% for blacks and 13% for blue collar workers were generated from the random selection of grand jurors from voter registration lists in Bergen County but held this disparity to be permissible.
Women and blacks are not unreasonably under-represented in the Essex County jury selection system and therefore defendants have not been denied their Sixth Amendment right to a jury drawn from a cross-section of the community. The statistical evidence of defendants shows a disparity for women at 6% *581 on the source list and 6.7% on the qualified list. These disparities which fall below the 10% disparity level mentioned in Swain, do not rise to the level of constitutional significance under either the federal or state constitutions.
Although greater than women, the disparity for blacks, 14.6% on the source list and 14.1% on the qualified list, is not violative of the defendants' federal or state constitutional rights. See Swain, supra; State v. Porro, supra. Supporting this conclusion is the fact that the process for selecting jurors from the source list is completely random. Defendants' claims of systematic exclusion are based upon the failure of Essex County to utilize source lists other than, or in conjunction with, the legislatively mandated voter registration and motor vehicle lists. See N.J.S.A. 2A:70-4. For defendants the source list is the core problem purportedly leading to or causing the under-representation in the qualified pool. They contend this is evidenced by their study which showed that the source list and qualified pool have approximately the same proportion of blacks, 21.3% and 21.8% respectively. More interesting however, is the increase in representation for blacks when we move from the source list to the qualified pool. This increase in representation as we move through the selection process is consistent with the results of the post-summons surveys of the race and sex of jurors reporting to the courthouse for jury service which was submitted by the state. If the disparities in Porro could be found permissible where the qualified pool was drawn solely from the voter registration list, then the disparities existing here drawn from a qualified pool of an integrated voter registration and driver's license lists would simply have to be considered permissible.
During a twelve-week period, the race and sex of jurors reporting for jury service were observed. A total of 4450 petit jurors and 455 grand jurors were observed. Of the 4450 petit jurors observed 47.64% were female and 32.20% were black; 52.74% of the 455 grand jurors were female and 24.61% were black. The significance of these figures is obvious. Not only *582 is there an increase in the representation of blacks and women, but the increase occurs in the most significant stage of the selection process in terms of defendants' right to a fair trial, among those jurors who report to the courthouse for jury service.[6]

E. THE EQUAL PROTECTION CHALLENGE
Defendants' claims for relief under the equal protection clause must fail. Defendants had the burden to show a recognizable, distinct class had been singled out for different treatment under the law by its substantial under-representation in the jury system. For reasons previously stated, Newark residents, young people, students and individuals characterized as having low incomes are not recognizable, distinct classes and therefore can not be the subject of an equal protection challenge.
Defendants have failed to show that blacks and women are substantially under-represented in the jury system. A showing of substantial under-representation is necessary to raise the presumption of intentional conduct which is the mainstay of an equal protection challenge. Therefore, having failed to make a showing of substantial under-representation, defendants have no basis to allege the denial of the equal protection of the law.

F. STATE CONSTITUTIONAL CLAIMS
Under the New Jersey Constitution (1947), defendants are entitled to a presentment or indictment of a grand jury (Art. 1, par. 8), and a trial by a petit jury (Art. I, par. 9). State v. Rochester, 54 N.J. 85 (1969). Defendants are also entitled to the same protections of these rights under the state constitution as they have under the federal. State v. Porro, 152 *583 N.J. Super. 259, 265 (Law Div. 1977), aff'd 158 N.J. Super. 269 (App.Div. 1978), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978) (necessary extension of both the Fifth and Sixth Amendments of the federal constitution is that the defendants be indicted and tried by juries of integrity, representative of a valid cross-section of the community); Smith v. Yeager, 465 F.2d 272, 275 (3 Cir.1972) (improper exclusion of jurors through employment of a "key man" system may result in denial of equal protection); N.J.Const. (1947), Art. I par. 5. Although our courts may interpret our constitution more expansively than the federal constitution, see State v. Schmid, 84 N.J. 535 (1980), app. dism. 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982), the federal standards applicable to jury challenges are appropriately invoked to guide a state court in detecting violations of a defendant's state constitutional rights. See State v. Smith, 55 N.J. 476 (1970); State v. Porro, supra.
No New Jersey decision has interpreted a defendant's rights in this area of jury selection more broadly than the definition of those rights under the federal constitution. This court discerns no reason why those rights should be more fully protected under the state constitution than they are by the application of the constitutional standards utilized in the federal sphere. Consequently, for the reasons stated in sections D and E, supra, defendants' claims for relief under the New Jersey Constitution (1947) are denied.

III. THE GRAND JURY FOREPERSON
Defendants contend that they have been denied the equal protection of the law because in Essex County during the 1979 through 1982 terms, blacks and women were purportedly excluded from serving as forepersons of the grand jury.[7] Whether *584 the role of the foreperson in the deliberations of the grand jury is more significant than the other members of the grand jury and therefore should be accorded special constitutional significance is an issue that has not been addressed in New Jersey and has occasioned a split of opinion among the federal circuits. See United States v. Perez-Hernandez, 672 F.2d 1380 (11 Cir.1982); Guice v. Fortenberry, 661 F.2d 496 (5 Cir.1981) (finding constitutional significance); United States v. Aimone, 715 F.2d 822 (3 Cir.1983); United States v. Coletta, 682 F.2d 820 (9 Cir.1982), cert. den. 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 433 (1983) (not finding constitutional significance).
Challenges to the selection process of the grand jury foreperson can be brought under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Due Process Clause of the Fifth Amendment to the United States Constitution, or corresponding provisions of the New Jersey Constitution. The Sixth Amendment right to cross-sectional representation of jury panels does not apply to grand jury forepersons. Aimone, 715 F.2d at 827, United States v. Hobby, 702 F.2d 466, 470-471 (4 Cir.1983), aff'd ___ U.S. ___, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984); Coletta, 682 F.2d at 822-824; United States v. Holman, 680 F.2d 1340, 1356-1357 (11 Cir.1982).
The United States Supreme Court has recently held that discrimination in the selection of the federal grand jury foreperson does not warrant the reversal of the conviction of, and dismissal of the indictment against, a white male bringing a claim under the Due Process Clause of the Fifth Amendment. United States v. Hobby, ___ U.S. ___, 104 S.Ct. 3093, 82 L.Ed.2d 260 (1984). The Court's decision was premised upon a finding that "the responsibilities of a federal grand jury foreman are essentially clerical in nature"; and that the "ministerial *585 trappings of the post carry with them no special powers or duties that meaningfully affect the rights of persons that the grand jury charges with a crime." Id. at ___, 104 S.Ct. at 3096. As the Supreme Court put it:
Simply stated, the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment. [Ibid.]
Defendants base the legitimacy of their equal protection challenge to the selection process of grand jury forepersons upon the plurality decision in Rose v. Mitchell, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), in which the Supreme Court reversed the Fifth Circuit's decision to grant federal habeas corpus relief because the respondents failed to make a prima facie case of discrimination in violation of the equal protection clause. Although the Supreme Court applied the usual standards for an equal protection challenge in deciding that respondents did not make a prima facie showing, the Court noted that for the purposes of its decision it would "assume without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside." Id. at 552, n. 4, 99 S.Ct. at 2998 n. 4.[8]
*586 The Supreme Court in Hobby was not faced with and did not address the issue of whether intentional discrimination in the selection of grand jury forepersons would violate a defendant's Fourteenth Amendment right to equal protection of the law. ___ U.S. at ___, 104 S.Ct. at 3098. However, a majority of the federal circuits faced with this issue have denied the claims of defendants who assert that discrimination in the selection of grand jury forepersons from an otherwise properly constituted grand jury denied them the equal protection of the law. See Aimone, supra; Colletta, supra; Holman, supra. These decisions, which utilized reasoning similar to that found in Hobby were predicated upon the facts that the federal grand jury foreperson is selected from among a randomly selected grand jury and performs merely ministerial functions. Aimone, supra, 715 F.2d at 827; Colletta, supra, 682 F.2d at 827.
This court does not find any constitutional significance in the position of grand jury foreperson in Essex County because the foreperson's responsibilities, like those of federal grand jury foreperson, can be characterized as nothing more than ministerial.
Defendants contend that the responsibilities delegated to the foreperson in Essex County places an imprimatur upon the foreperson which enables him or her to influence the decision of the other members of the jury. They rely on the testimony of Dr. Richard Ashmore, a social psychologist, who opined on the *587 effect the office of grand jury foreperson would have on the deliberating members of the grand jury. Based upon his assessment of the conditions surrounding the appointment of the grand jury, the selection of the foreperson, the conditions under which the grand jury operates, and the purposes and goals of the grand jury, it was Dr. Ashmore's conclusion that a considerable amount of foreperson influence could have occurred prior to the actual voting of the grand jury. The appointment of the foreperson and the separate swearing in by the assignment judge, combined with the ability of the foreperson to unconsciously inject his subjective bias by selecting the order of questioning and giving special recognition to those with whom he is aligned, resulted in Dr. Ashmore's conclusion that the vote of the foreperson had two to five times the impact of the vote of any other grand juror.
Dr. Ashmore's views, although based upon recognized principles of group dynamics, were unconvincing as applied to the grand jury as it functions in Essex County. The Essex County grand jury is sworn to an oath which in effect requires all jurors to base their decisions upon the evidence presented using the best of their skill and understanding, and act according to the dictates of their conscience. To suggest that these citizens, who are charged as grand jurors to administer the law in this county, will be swayed in their decisions not by the evidence presented or lack thereof, but by the decisions or actions of a foreperson elevated by the performance of ministerial functions is totally unpersuasive.
As in the federal system, duties of the Essex County grand jury foreperson are only ministerial and do not independently affect the rights of a defendant. In both systems, the office of grand jury foreperson is not a creature of the constitution; instead, the post of foreperson was originally created for the convenience of the court. See Hobby, supra, ___ U.S. at ___, 104 S.Ct. at 3094; N.J.S.A. 2A:73-3 and -4; R. 3:6-4. In both systems the foreperson is selected after the grand jury has been empaneled from among those who have been so empaneled. *588 In both systems the foreperson has no authority apart from that of the grand jury as a whole to act in a manner that determines or influences whether an individual is to be prosecuted. Hobby, supra.
The similarities between these two systems was further emphasized by the head clerk of the Essex County grand jury, Charles Kamps, who testified about the responsibilities of the foreperson. The foreperson maintains decorum by acknowledging the other members of the jury when they wish to ask questions of the witnesses testifying before the grand jury. The foreperson speaks for the jury by relaying complaints or questions of the other members to the clerk or assignment judge. The foreperson is permitted to excuse other members of the jury when it becomes inconvenient for them to serve on any particular day. Finally, the foreperson signs the "bills" and "no bills" and returns the indictments to the assignment judge.
What the Fourth Circuit said in Hobby about federal grand juries would apply with equal force to an Essex County grand jury:
The impact of the [Essex County] grand jury foreman as distinguished from that of any other grand juror, upon the criminal justice system and the rights of the persons accused is minimal and incidental at best. Any suspicion that this office may enlarge his capacity to influence other grand jurors is too vague and uncertain to warrant dismissals of indictments and reversals of convictions. [United States v. Hobby, supra, 702 F.2d at 471]
The Essex County grand jury foreperson has no more power than any other member of the grand jury panel; therefore defendants' claims that blacks and women were intentionally excluded from the position of grand jury foreperson are without constitutional significance in an equal protection challenge.
Even assuming, arguendo, that the position of grand jury foreperson is constitutionally significant under the Equal Protection Clause of the Fourteenth Amendment, defendants have made no showing of intentional discrimination which would entitle them to relief. Their claim of intentional discrimination is based upon the selection process which enables the assignment *589 judge to view the sex and race of the members of the randomly selected grand jury before the foreperson and deputy foreperson are selected from its ranks. This system which they contend provides an opportunity to discriminate combined with the alleged under-representation of blacks and women in the position of foreperson for the period in question raises a presumption of intentional discrimination. See, Rose v. Mitchell, supra; United States v. Perez-Hernandez, supra; Guice v. Fortenberry, supra. Assuming the under-representation is substantial and the system is one which is susceptible to abuse, defendants' prima facie case has been effectively rebutted by the state's proof of a lack of discriminatory intent. Both Judge Scalera and Judge Blake testified that their primary concern was to pick a person who was qualified to perform the ministerial functions of the foreperson. Nothing in the testimony of either assignment judge indicated an express or subjective intention to exclude women or blacks from the position of grand jury foreperson. To the contrary, they made conscious efforts to include blacks and women in the post of foreperson and deputy foreperson. This record also bears out the fact that blacks and women were appointed to these positions by both Judges Scalera and Blake. Without evidence of intentional discrimination, defendants' claim of the purposeful exclusion of blacks and women from the position of grand jury foreperson in violation of the Equal Protection Clause must fail.

IV. STATUTORY VIOLATIONS
The defendants also allege various violations of the New Jersey statutes which codify our jury selection system. These alleged violations include the discretionary selection of grand jurors by the assignment judge,[9] the improper exclusion of *590 students and teachers, the improper exclusion of eighteen-year olds, and other improper miscellaneous disqualifications.

A. SELECTION OF GRAND JURORS
It is the responsibility of the assignment judge in each county to select one or more grand juries for the county. R. 3:6-1. Testimony was introduced from the former Essex County Assignment Judge, the Honorable Arthur Blake, and his successor, the Honorable Nicholas Scalera, outlining the methods they used to select grand jurors. Since all defendants were indicted by grand juries selected by the presiding Assignment Judge Nicholas Scalera, only statutory violations occasioned by his selection method would entitle the defendants to relief.
A randomly selected panel of prospective grand jurors is summoned to appear for service on a given date. Judge Scalera testified that upon receipt of the summons and realization that they are faced with a potential six weeks of service, almost every juror submits a written request to be excused from service. These letters are screened by the clerk's office and the obviously meritorious requests are granted. Judge Scalera will review the letters and questionnaires before the panel is called in. At the time of the selection of the grand jury, Judge Scalera reconsiders or further considers the decisions of the clerk concerning requests to be excused and evaluates the new requests and supplemental information received on the day of empaneling. Judge Scalera then calls the jurors individually in their random order. In conjunction with a final review of their questionnaires and any letters or submissions they had given, the jurors are asked whether they have *591 any objection to serving on the grand jury. After a brief voir dire, Judge Scalera, taking into consideration all the information he has about the particular juror, will seat or excuse the juror in an effort to select those jurors who will represent a cross-section of the community and perform responsibly the functions of a grand juror.
Defendants claim that Judge Scalera's method of seating the grand jury contravenes N.J.S.A. 2A:73-1. N.J.S.A. 2A:73-1 reads:
If, from any grand jury panel, more persons remain available for service, after excuses have been allowed, than are necessary to constitute the grand jury, the persons whose names are first drawn and not excused, not to exceed twenty-three in number, shall constitute the grand jury.
The defendants claim that the "shall" in N.J.S.A. 2A:73-1 indicates the Legislature's intent that this statute be interpreted as an imperative thereby entitling a defendant to the dismissal of an indictment for any deviation from its dictates in the seating of grand jurors. In other words, those first drawn and not excused, must be seated in the order they are drawn in order to preserve the randomness of their selection. Defendants also allege that Judge Scalera's voir dire of prospective grand jurors introduces an element of discretion not contemplated by the statute, disrupting the randomness of the selection, and is reminiscent of the "key man" system invalidated in Smith v. Yeager, 465 F.2d 272 (3 Cir.1972). In defendant's view, N.J.S.A. 2A:73-1 must be read as mandatory and not merely directory.
In support of defendant's argument, reliance is placed on State v. Wagner, 180 N.J. Super. 564 (App.Div. 1981). In Wagner, the Appellate Division reversed the convictions of defendants who were tried before a jury empaneled by a judge who completely and blatantly ignored the procedure outlined in N.J.S.A. 2A:74-1 for the empaneling of petit jurors and substituted his own method of selection. Pursuant to N.J.S.A. 2A:74-1, the selection of a petit jury begins by placing the *592 names of all the members of a panel in a box.[10] Names are then drawn from the box, and jurors seated, until twelve persons remain after all challenges are made and excuses granted. These twelve are then sworn as the petit jury. In Wagner, the judge placed the first fourteen jurors who entered the room in the jury box. As jurors were challenged and excused following questioning, the judge replaced them by calling upon other jurors seated in various rows in the courtroom by starting at one point in the courtroom and going down the row.
Defendants offer the reversal of the convictions in Wagner as evidence of the court's abandonment of an interpretation of the jury selection statutes as directory. Without offering any opinion as to the value of protections afforded a defendant from these two rights which are both derived from the 1947 State Constitution, it is significant that the Wagner decision involved the selection of a petit jury and not a grand jury as in the case at bar in which a very clearly delineated method of jury seating was spelled out. It is also significant that the Wagner decision dealt with the wholesale abandonment of the prescribed statutory *593 procedure when Judge Scalera's conduct can be characterized as nothing less than an effort to comply with the statutory provisions for the empanelment of grand jurors. For these reasons this court does not find that the inference which defendants seek to draw from Wagner is applicable. The Wagner case is inapposite.
This court is also satisfied that N.J.S.A. 2A:73-1 does not preclude the assignment judge from exercising any discretion in the selection of the grand jury. To the contrary, the dynamics of the selection process require that the assignment judge exercise discretion. The plain language of the statute directs the seating of the first twenty-three jurors "whose names are first drawn and not excused." N.J.S.A. 2A:73-1. It is the assignment judge's clear responsibility to rule on excuses and such rulings necessarily require the exercise of judgment tempered by experience and discretion circumscribed by the judicial oath to uphold the law.
The Supreme Court has vested in the assignment judge, as chief judicial officer, plenary responsibility for the administration of all the courts in a vicinage. R. 1:33-4(a). As part of his important duties, the assignment judge must empanel the grand juries for the county. R. 3:6-1. The assignment judge bears a weighty responsibility in empaneling the grand jury. Faced with a panel of citizens reluctant to make the sacrifice their civic duty requires of them, the assignment judge must separate the legitimate excuse from the frivolous, and empanel those citizens who are able to perform, properly and conscientiously, the important task of the grand jury.
Historically, the grand jury has acted as an independent buffer between the State and the accused. See, e.g., State v. Porro, 152 N.J. Super. 179 (App.Div. 1976), cert. den. 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978). Because of this important role of the grand jury in our criminal justice system it is, as Judge Scalera stated, paramount that the grand jury be comprised of individuals who will achieve a "fair and impartial *594 determination of each case on the basis of evidence presented and not upon sympathy, bias, prejudice or any extraneous influence of any kind." The situation is a highly fluid one in which the assignment judge, of necessity, has to be invested with discretion in order to insure that a minimum of twenty-three persons will be available for service. If everyone who asked not to serve was readily excused, the complement of jurors could not be filled. Both Judges Scalera and Blake recognized this unacceptable reality and tried to deal with it in a manner that would insure that the full number of grand jurors would be seated. Judge Scalera's method of empaneling grand juries comported with the procedure contemplated by N.J.S.A. 2A:73-1 and the rules of court, R. 3:6-1, thereby occasioning no statutory violation which would entitle defendants to relief.

B. THE IMPROPER EXCLUSION OF STUDENTS, TEACHERS, EIGHTEEN-YEAR OLDS AND OTHER IMPROPER MISCELLANEOUS EXCLUSIONS.
Defendants allege that students, teachers, and eighteen-year olds were systematically excluded from jury service in contravention of N.J.S.A. 2A:69-1 et seq. This court is satisfied based upon the testimony of the representatives of the office of jury management that students and teachers were not excluded from service but merely deferred from service until a time when jury duty would be less burdensome. It is also clear that eighteen-year olds, based upon the testimony and the production of qualification questionnaires, were not systematically excluded from jury service. Finally, this court also finds no merit in defendants' allegations of improper miscellaneous exclusions. It is this court's conclusion, therefore, that the actions of the office of jury management in the evaluation and granting of excuses were not violative of N.J.S.A. 2A:69-1 et seq. and consequently defendant's claims for relief are denied.
*595 While this court is satisfied that the present system of the selection and empanelment of grand and petit jurors passes constitutional muster and does not violate any state provisions, the court system in New Jersey has not been insensitive to its obligation to strive to attain the most representative and efficient jury selection system possible. The Jury Utilization and Management Task Force chaired by Justice Robert Clifford and appointed by Chief Justice Wilentz in 1981, has completed its study of the New Jersey petit jury system and has submitted its recommendations for administrative and statutory reforms to the legislature. These recommendations have received legislative attention and bills have been introduced for further legislative action. See Senate Bill 767 (1984) (bill to eliminate the voter registration lists from the source list); Assembly Bill 248 (1984) (bill concerning the supervision of juries and selection of juries); Senate Bill 854 (1984) (bill to increase compensation for petit jury service); Senate Bill 649 (1984) (bill to increase travel allowance for jury service); Senate Bill 865 (bill to exempt senior citizens 65 or older from jury service); Assembly Bills 3025, 3026 (1983) (bills including statutory reforms of the task force and eliminating the automatic exemption for persons directly or indirectly connected with the administration of justice). Although the system in its present form fulfills the constitutional requirement to provide defendants with grand and petit juries drawn from every segment of society, the implementation of the task force's recommendations will mark even greater improvement in an already laudable system.

V. CONCLUSION
For the reasons expressed, defendants failed to prove that the jury selection process for Essex County was unconstitutionally unrepresentative or violative of the New Jersey jury selection statutes. Accordingly, defendants' motion for the reversal of convictions and/or the dismissal of indictments is denied in all respects.
NOTES
[1] The thirteen defendants joined in this motion are:

 Renee Nicely Indictment No. 1396-82
 Allen Bass Indictment No. 1396-82
 Raymond Kelly Indictment No. 746-2-83
 Stanley Griffin Indictment No. 746-2-83
 Hubert King Indictment No. 747-2-83
 Victor McCrary Indictment No. 748-2-83
 Humphrey Cohen Indictment No. 1433-3-83
 Maurice Howard Indictment No. 1184-3-83
 Willie Douglas Indictment No. 1670-4-83
 Rafael Rivera Indictment No. 2578-8-83
 Sebastian Montouri Indictment No. 3031-10-83
 Jose Hernadez Indictment No. 3580-11-83
 Willie Smith Indictment No. 3582-11-83

[2] The geographic inference method is a procedure in which the race of a particular juror is inferred from the area of Essex County in which he/she lives. The county was broken up into tracts. The racial makeup of the tract is determined from census data. Each name on the racially neutral source list is identified with a particular tract in the county. If the tract in which the juror resides is classified as 90-100% black, the race of the juror is inferred to be black. If the tract in which the juror resides is classified as 0-10% black, the juror is inferred to be white. Jurors living in tracts classified as 11-89% black were not counted.
[3] Although the defendants offered alternative measures of the disparities represented by these statistics, specifically the comparative disparity and statistical significance test, the court chooses to consider only the absolute disparity measurement thereby following the lead of many of the federal courts who have also entertained challenges to jury selection procedures. See Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The absolute disparity is achieved by simply subtracting the percentage of the group which appears on the list from the percentage of that group in the population.
[4] This court is fully satisfied that defendants' statistical disparities, even if applied in complete conformity with the table above, do not provide a basis for constitutional relief. As a consequence, it was unnecessary to evaluate the credibility of the expert witnesses or methods utilized by them in arriving at the absolute disparities.
[5] Since no distinction has been made in the case law between defendants' right to a cross-section in a grand jury venire as opposed to a petit jury venire, the court's reasoning in Forer is equally applicable to the instant motion which challenges the selection process for both the grand and petit juries.
[6] Interestingly enough, the actual composition of the jury which deliberated in Ramsuer for both the trial and penalty stages was made up of seven blacks, four of whom were men and three of whom were women. Out of the five deliberating white jurors, there were four men and one woman.
[7] This court has not addressed the standing issue urged by the State to be a prerequisite for raising an equal protection argument. Suffice it to say, standing, even under a strict standard approach, would devolve on at least one of the fourteen defendants so as to require this court to deal with the merits of the constitutional claim.
[8] The Supreme Court cautions us in Hobby, that Rose v. Mitchell must be read in light of the method used in Tennessee to select a grand jury and its foreperson.

Under that system, 12 members of the grand jury were selected at random by the jury commissioners from a list of qualified potential jurors. The foreman, however, was separately appointed by a judge from the general eligible population at large. The foreman then served as "the thirteenth member of each grand jury organized during his term of office, having equal power and authority in all matters coming before the grand jury with the other members thereof" Rose v. Mitchell, supra, at 548, n. 2 [99 S.Ct. at 2996, n. 2]. (Quoting Tenn. Code Ann. § 40-1506 (Supp. 1978). The foreman selection process in Rose therefore determined not only who would serve as presiding officer, but also who would serve as the thirteenth voting member of the grand jury. The result of discrimination in foreman selection under the Tennessee system was that 1 out of 13 grand jurors had been selected as a voting member in an impermissible fashion. [Hobby, supra, ___ U.S. at ___, 104 S.Ct. at 3098.]
The foreman, as noted, was selected by the judge from the general eligible population and not from the empaneled grand jurors. In addition, the responsibilities of the Tennessee grand jury foreperson were also more significant than either the federal or Essex County grand jury forepersons. The Tennessee foreperson served for two years and could be, and often was, reappointed. The foreperson was expected to assist the district attorney in investigating crimes, could conduct the questioning of witnesses, and had to sign an indictment for it to be valid. See Rose, supra, 443 U.S. at 548, n. 2, 99 S.Ct. at 2996, n. 2. It is clear that the Tennessee grand jury foreperson was in a position to guide the decision making process of the grand jury and had substantially greater power than his federal or Essex County counterpart. See Aimone, supra, 715 F.2d at 827.
[9] Footnote 66 on page 90 of defendants' brief implies that the alleged improper selection of grand jurors "raises a constitutional issue similar to discrimination in the selection of grand juror forepersons." However, throughout this proceeding it was the sole position of defendants regarding the grand jury that a grand jury selected from the constitutionally infirm source list would be a priori unrepresentative. No survey was conducted nor evidence adduced which would substantiate a claim that defendants were not indicted by constitutionally representative grand juries. If defendants are entitled to any relief resulting from the alleged improper selection of grand juries, that relief must be predicated upon violations of state law and not constitutional grounds as defendants imply.
[10] N.J.S.A. 2A:74-1 provides:

The name of each person summoned and returned by a sheriff or other proper officer as a petit juror shall be written or printed on separate pieces of paper of as nearly as possible uniform size, color and shape. The sheriff or other proper officer or the clerk of the court, or a person designated by the sheriff, officer or clerk for that purpose, shall roll up each piece of paper separately and deposit it in a box.
When a jury is required for the trial of a cause, either civil or criminal, the box in which the names have been placed shall be shaken so as to intermix thoroughly the pieces of paper therein, and the sheriff, clerk or other person shall, by direction of the court, publicly and in open court, draw from the box, one at a time, the pieces of paper therein, until 12 persons or six persons in such civil causes as may be authorized by the New Jersey Court Rules, whose names are found written thereon, shall appear. If any of the 12 persons so appearing are successfully challenged or excused from serving on that jury, the drawing shall be continued until 12 persons or six persons in an appropriate civil cause not so challenged or excused appear, and they, being severally sworn, shall constitute the jury for the trial of such cause.